Michele Haydel Gehrke (SBN 215647)
mgehrke@reedsmith.com
Brandon Nhan (SBN 335573)
Bnhan@reedsmith.com
REED SMITH LLP
101 Second Street
Suite 1800
San Francisco, CA 94105-3659
Telephone: +1 415 543 8700
Facsimile: +1 415 391 8269

Attorneys for Defendants
United Airlines, Inc. and Juliana Petani

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLADYS C. SALAS,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED AIRLINES, INC., a Delaware Corporation, JULIANA PETANI, an individual, and DOES 1 to 100, inclusive,<br><br>Defendants. | Case Number:<br>3:22-cv-04574-RFL<br><br>**DEFENDANT UNITED AIRLINES, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>DATE: June 18, 2024<br>TIME: 10:00 a.m.<br>Courtroom: 15<br><br>[ASSIGNED TO HON. RITA F. LIN]<br><br>[*Filed concurrently with Memorandum of Points and Authorities; Declarations of Michele Haydel Gehrke and Robert Krabbe; Request for Judicial Notice*] |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## NOTICE OF MOTION AND MOTION

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE on June 18, 2024 at 10:00 a.m., or as soon thereafter as this matter may be heard in the above-entitled Court located at San Francisco Courthouse, Courtroom 15, 18th Floor, 450 Golden Gate Ave., San Francisco, CA 94102, Defendant United Airlines, Inc. ("United" or "Defendant") will and hereby does move the Court pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment or, in the alternative, partial summary judgment on all claims asserted against it by Gladys Celeste Salas' ("Plaintiff") in her First Amended Complaint ("FAC").

United seeks summary judgment on the grounds that there is no genuine dispute as to any material facts as to Plaintiff's causes of action. In the alternative, if for any reason full summary judgment is not granted, United seeks: (i) partial summary judgment of the following matters in its favor; and (ii) providing that no further proof thereof shall be required at trial and that any final judgment in this action shall, in addition to the matters determined at trial, be based upon the matters as so adjudicated. The independent basis for summary judgment or, in the alternative, partial summary judgment for which United requests the Court to decide is as follows:

1. Discrimination based on disability/perceived disability and age.

a. Disability discrimination: (1) Plaintiff fails to establish a *prima facie* case for discrimination because she did not suffer from a disability under the Fair Employment Housing Act ("FEHA"); (2) Plaintiff fails to establish a *prima facie* case for discrimination because there was no causal link between her termination and disability; (3) Plaintiff claims fail because United's termination was for legitimate, non-discriminatory reasons and she cannot present admissible evidence the reason was pretextual; and (4) Plaintiff's claims are preempted by the Railway Labor Act ("RLA").

b. Perceived disability discrimination: (1) Plaintiff fails to establish a *prima facie* case for discrimination because the condition she claims she was "regarded as" having was not a disability under the FEHA; (2) Plaintiff fails to establish a *prima facie* case for perceived disability discrimination because she cannot present admissible evidence United perceived her as having a disabling condition; (3) Plaintiff fails to establish a *prima facie* case for discrimination because there was no causal link between her termination and her perceived disability; (4) Plaintiff's claims fail

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

because United's termination was for legitimate, non-discriminatory reasons and she cannot present admissible evidence the reasons were pretextual; and (5) Plaintiff's claims are preempted by the RLA.

c. <u>Age discrimination</u>: (1) Plaintiff fails to establish a *prima facie* case for age discrimination because she was not performing her job satisfactorily; (2) Plaintiff fails to establish a *prima facie* case for age discrimination because she cannot present admissible evidence she was replaced by substantially younger employees or under circumstances giving an inference of age discrimination; (3) Plaintiff fails to establish a *prima facie* case for discrimination there was no causal link between her termination and her age; (4) Plaintiff's claims fail because United's termination was for legitimate, non-discriminatory reasons and she cannot present admissible evidence the reasons were pretextual; and (5) Plaintiff's claim is preempted by the RLA.

2. <u>Harassment based on disability/perceived disability and age</u>. (1) Plaintiff fails to establish she was harassed based on disability or perceived disability because her alleged actual/perceived condition was not a disability under the FEHA; (2) the purported harassing conduct constituted personnel management actions; (3) the purported harassing conduct was not severe or pervasive; (4) there is no causal link between her disability, perceived disability, and/or age and the purported harassing conduct; and (5) Plaintiff's claim is preempted by the RLA.

3. <u>Retaliation</u>. (1) Plaintiff fails to establish a *prima facie* case for retaliation because there is no causal link between any purported protected activity and her termination; (2) Plaintiff's claims fail because United's termination was for legitimate, non-discriminatory reasons and she cannot present admissible evidence the reasons were pretextual; and (3) Plaintiff's claims are preempted by the RLA.

4. <u>Failure to engage in the interactive process</u>. (1) Plaintiff's claims fail because she did not suffer from a disability under the FEHA; (2) Plaintiff claims fail because the only accommodation she requested was approved by United and she did not request any other accommodation creating an obligation to engage; (3) Plaintiff's claims fail because Plaintiff caused any alleged failure to engage in the interactive process; and (4) Plaintiff's claims are preempted by the RLA.

5. <u>Failure to provide reasonable accommodation</u>. (1) Plaintiff's claims fail because she did not suffer from a disability under the FEHA; (2) Plaintiff's claims fail because the only accommodation

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

she requested was approved by United and she did not request any other accommodation; and (3) Plaintiff's claims are preempted by the RLA.

6. <u>Failure to prevent/investigate/correct</u>. (1) Plaintiff's claims fail because they are derivative of the FEHA claims and the underlying claims fail; and (2) the undisputed material facts show United took reasonable steps to prevent any discrimination, harassment, or retaliation and Plaintiff failed to utilize United's reporting procedures to complain.

7. <u>Wrongful termination in violation of public policy</u>. (1) Plaintiff's claims fail because they are derivative of the FEHA claims and the underlying claims fail; (2) Plaintiff's claim fails because there was no causal link between her termination and any purported protected activity; (3) Plaintiff's claims fail because United's termination was for legitimate reasons and she cannot present admissible evidence the reasons were pretextual; and (4) Plaintiff's claims are preempted by the RLA.

8. <u>Violation of Business and Professional Code section 17200</u>. Plaintiff's claims fail because they are derivative of the FEHA claims and the underlying claims fail. Thus, Plaintiff cannot prove United engaged in any conduct that is unfair, unlawful or fraudulent under the statute.

9. <u>Prayer for relief for punitive damages</u>. (1) Plaintiff's prayer for punitive damages fails because she cannot present admissible evidence of malice, oppression, or fraud; (2) Plaintiff's prayer for punitive damages fails because she cannot present admissible of evidence of malice, oppression, or fraud from an officer, director, or managing agent of United; (3) Plaintiff's prayer for punitive damages fails because she cannot present admissible evidence that an officer, director, or managing agent of United ratified conduct constituting malice, oppression, or fraud.

United bases its Motion on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the supporting Declarations of Michele Haydel Gehrke and Robert Krabbe, and attached exhibits, Request for Judicial Notice, all opposition and reply papers thereto, the argument of counsel, and any other evidence that may be presented at the hearing on this matter.

/ /
/ / /
/ / /
/ / /

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    DATED: April 16, 2024

2                                                    REED SMITH LLP

3

4                                                    By: /s/ Michele Haydel Gehrke
                                                         Michele Haydel Gehrke
5                                                        Brandon Nhan
                                                         Attorneys for Defendants
6                                                        UNITED AIRLINES, INC. and JULIANA
                                                         PETANI

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................... 1

II. UNDISPUTED MATERIAL FACTS .......................................................................... 3

    A.    Plaintiff's Employment. ................................................................................ 3

    B.    United's Pass Travel Policies. ....................................................................... 3

    C.    United's COVID Policies and Practices ....................................................... 3

    D.    Absence from Work in October to December 2020 and Travels to Florida. ............... 5

        1.    Initial Absence from Work in October to November 2020. ......................... 5

        2.    United Extends Plaintiff's Paid Leave Until December 1, 2020. ................... 5

        3.    While on Paid Leave, Plaintiff Uses Pass Travel to Take a Vacation to Florida. ..................................................................................... 7

        4.    Plaintiff Misrepresents Her Condition so She Can Board Her Free Flight In Violation of United Policy and Guidance of Health Authorities. ................................................................................................. 8

        5.    Plaintiff Is Cleared to Return to Work on December 1 Without Restrictions. ................................................................................................. 8

    E.    United Conducts an Investigation Under the JCBA. ..................................... 9

    F.    United Concludes Plaintiff Violated its Policies and Terminates Her Employment. ................................................................................................. 10

    G.    Plaintiff Grieves Her Termination Under the JCBA. .................................... 11

III. ARGUMENT .......................................................................................................... 11

    A.    Plaintiff's Discrimination and Retaliation Claims Fail as a Matter of Law. ............. 11

        1.    Disability Discrimination ................................................................. 12

            a.    Plaintiff's Discrimination Claim Fails as She Did Not Have a Disability under the FEHA. ..................................................... 12

            b.    Plaintiff's "Regarded As" Claim Fails Because There is No Evidence That the Decisionmaker Perceived Her as Having a Disabling Condition. ........................................................... 15

            c.    There is No Evidence Plaintiff was Terminated "Because Of" Her Alleged Disability. .............................................. 15

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

2.      Plaintiff Has No Evidence Raising an Inference of Age-Based Motive for Termination.................................................................. 16

3.      Retaliation Claim .................................................................... 17

B.      Plaintiff's Discrimination and Retaliation Claims Fail Because United Had Legitimate Non-Discriminatory and Non-Retaliatory Grounds for Termination........................................................................................... 18

C.      Plaintiff's Discrimination and Retaliation Claims Fail Because She Cannot Demonstrate United's Legitimate Grounds for Termination Were Pretextual. .......................................................................................... 19

D.      Plaintiff Fails to Establish Harassment Based on Age and Disability, Perceived or Actual, under the FEHA. ...................................................... 22

1.      The Purported Harassing Conduct Constitutes Personnel Management Actions. ............................................................. 23

2.      The Purported Harassing Conduct Was Not Severe or Pervasive. ............... 25

3.      There is No Causal Nexus Between the Conduct and Plaintiff's Protected Status.................................................................... 25

E.      There is No Triable Issue of Fact on Plaintiff's Failure to Accommodate Claim........................................................................................... 26

F.      Plaintiff's Failure to Engage in the Interactive Process Claim Fails. ....................... 27

G.      The RLA Preempts Plaintiff's Claims. ...................................................... 28

H.      There is No Record Evidence to Support Punitive Damages. .................................. 30

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Aguilar v. Avis Rent A Car Sys., Inc.*,
5
    21 Cal.4th 121 (1999) ........................................................................22

6
*Alamillo v. BNSF Ry.*,
    869 F.3d 916 (9th Cir. 2017) ...........................................................12
7

*Alaska Airlines, Inc. v. Schurke*,
8
    898 F.3d 904 (9th Cir. 2018) ...........................................................28

9
*Areopaja v. Morrison Mgmt. Specialists*,
10
    2023 U.S. Dist. LEXIS 43949 (C.D. Cal. Mar. 14, 2023) .................13, 14

11
*Carr v. Allied Waste Sys.*,
    2010 U.S. Dist. LEXIS 124192 (N.D. Cal. Nov. 23, 2010)....................29
12

13
*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................11

14
*Cenis v. Winco Holdings, Inc.*,
15
    2018 U.S. Dist. LEXIS 89301 (E.D. Cal. May 25, 2018).....................13

16
*Choochagi v. Barracuda Networks, Inc.*,
    60 Cal. App. 5th 444 (2020) ...........................................................19
17

18
*Cleveland v. Waste Mgmt.*,
    1999 U.S. Dist. LEXIS 1389 (N.D. Cal. Feb. 1, 1999) .....................12

19
*Cobb v. Alaska Airlines, Inc.*,
20
    2023 U.S. App. LEXIS 7066 (9th Cir. March 3, 2023)........................18

21
*Coleman v. Child.'s Hosp. of Phila.*,
    2023 U.S. Dist. LEXIS 201275 (E.D. Pa. Nov. 8, 2023)......................14
22

23
*Coleman v. Quaker Oats Co.*,
    232 F.3d 1271 (9th Cir. 2000) ........................................................12

24
*Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*,
    491 U.S. 299 (1989)........................................................................28
25

26
*De Paz v. Wells Fargo Bank, N.A.*,
    2019 U.S. Dist. LEXIS 230933 (C.D. Cal. Dec. 10, 2019) .................21, 30
27

*DeHorney v. Bank of America Nat. Trust and Sav. Ass'n*,
28
    879 F.2d 459 (9th Cir. 1989) ...........................................................20

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*DFEH v. Lucent Techs., Inc.,*
   642 F.3d 728 (9th Cir. 2011) ....................................................................19, 21, 27

*Diaz v. Eagle Produce Ltd. P'ship,*
   521 F.3d 1201 (9th Cir. 2008) ..........................................................................16

*Drepaul v. Wells Fargo Bank, N.A.,*
   2024 U.S. Dist. LEXIS 5851 (D.Conn. Jan. 11, 2024)........................................14

*Dumas v. New United Motor Mfg., Inc.,*
   305 Fed. Appx. 445 (9th Cir. 2008).....................................................................18

*Duran v. DHL Express (USA), Inc.,*
   2016 U.S. Dist. LEXIS 23331 (C.D. Cal. Feb. 24, 2016)....................................24

*Earl v. Good Samaritan Hosp. of Suffern,*
   2021 U.S. Dist. LEXIS 186182 (S.D.N.Y. Sept. 28, 2021)..................................12

*Espinal v. Nw. Airlines,*
   90 F.3d 1452 (9th Cir. 1996) ..............................................................................28

*Faragher v. City of Boca Raton,*
   524 U.S. 775 (1998).............................................................................................26

*Friday v. Hughes Aircraft Co.,*
   188 Cal.App.3d 117 (1986) .................................................................................29

*Fromson v. Georgia-Pac. Cons. Prods.,*
   2014 U.S. Dist. LEXIS 23733 (N.D. Cal. Feb. 24, 2014) ...................................30

*Gelfo v. Lockheed Martin Corp.,*
   140 Cal.App.4th 34 (2006) ............................................................................26, 27

*Gonzales v. City of Martinez,*
   638 F. Supp. 2d 1147 (N.D. Cal. 2009) ..............................................................23

*Guthmann v. Classic Residence Mgmt. L.P.,*
   2017 U.S. Dist. LEXIS 109845 (N.D. Cal. July 14, 2017)..................................21

*Guz v. Bechtel Nat. Inc.,*
   24 Cal.4th 317 (2000) .....................................................................................11, 12

*Hawaiian Airlines, Inc. v. Norris,*
   512 U.S. 246 (1994).............................................................................................28

*Kaplan v. Baxter Healthcare, Inc.,*
   2011 U.S. Dist. LEXIS 164273 (C.D. Cal. Nov. 28, 2011).................................19

*King v. United Parcel Services, Inc.,*
   152 Cal.App.4th 426 (2007) ...........................................................................21, 27

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Kroeger v. L3 Techs., Inc.*,
  2018 U.S. Dist. LEXIS 43006. (C.D. Cal. Mar. 15, 2018) ...................................29

*Kroeger v. Vertex Aerospace LLC*,
  2020 U.S. Dist. LEXIS 117323 (C.D. Cal. June 30, 2020) .................................24

*Lawler v. Montblanc N. Am., LLC*,
  704 F.3d 1235 (9th Cir. 2013) .................................................................22

*Lomeli v. Hull & Co.*,
  2010 U.S. Dist. LEXIS 161356 (C.D. Cal. Nov. 9, 2010) ...................................30

*Lundstrom v. Contra Costa Health Servs.*,
  2022 U.S. Dist. LEXIS 214812 (N.D. Cal. Nov. 29, 2022) ............................13, 15

*Lurie v. Konica Minolta Bus. Sols. U.S.A.*,
  2016 U.S. Dist. LEXIS 48511 (C.D. Cal. Apr. 11, 2016) ...................................25

*Lyle v. Warner Bros. Television Prods.*,
  38 Cal.4th 264 (2006) ...........................................................................25

*McCarthy v. R.J. Reynolds Tobacco Co.*,
  819 F. Supp. 2d 923 (E.D. Cal. 2011) .......................................................27

*Merrick v. Hilton Worldwide*,
  867 F.3d 1139 (9th Cir. 2017) .................................................................16

*Monegas v. City of San Francisco Dep't of Pub. Health*,
  2023 U.S. Dist. LEXIS 155590 (N.D. Cal. Sep. 1, 2023) ...................................15

*Nadaf-Rahrov v. Neiman Marcus Group, Inc.*,
  166 Cal.App.4th 979 (Cal. Ct. App. 2008) ..................................................28

*Nelson v. Pima Cmty. College*,
  83 F.3d 1075 (9th Cir. 1996) .................................................................11

*Newell v. State Univ. of N.Y. Westchester Cmty. Coll.*,
  2023 U.S. Dist. LEXIS 105901 (S.D.N.Y. Jun. 20 2023) ...................................12

*Opara v. Yellen*,
  57 F.4th 709 (9th Cir. 2023) .................................................................18

*Price v. Starbucks Corp.*,
  192 Cal.App.4th 1136 (2011) ..................................................................12

*Prillman v. United Air Lines, Inc.*,
  53 Cal.App.4th 935 (1997) .....................................................................26

*Ramirez v. Little Caesars Enters., Inc.*,
  2018 U.S. Dist. LEXIS 189135 (C.D. Cal. Nov. 2, 2018) ...................................24

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

*Rivera v. Philip Morris, Inc.*,
   395 F.3d 1142 (9th Cir. 2005) ................................................................11

*Roby v. McKesson Corp.*,
   47 Cal.4th 686 (2009) ...........................................................................24

*Roman v. Hertz Local Edition Corp.*,
   2022 U.S. Dist. LEXIS 88154 (S.D. Cal May 16 2022).........................13

*Rope v. Auto-Chlor Sys. of Washington, Inc.*,
   163 Cal.App.4th 635 (2013) ..................................................................17

*Ross v. County of Riverside*,
   36 Cal. App. 5th 580 (2019) ..................................................................15

*Rund v. Charter Communs., Inc.*,
   2007 U.S. Dist. LEXIS 19707 (E.D. Cal. Mar. 20, 2007) .....................16

*Scotch v. Art Institute of California-Orange County, Inc.*,
   173 Cal.App.4th 986 (2009) ..................................................................27

*Shinde v. Coffman Engineers, Inc.*,
   584 F. App'x 398 (9th Cir. 2014) ..........................................................12

*Taylor v. Trees, Inc.*,
   58 F. Supp. 3d 1092 (E.D. Cal. 2014)....................................................30

*Trujillo v. N. Cty. Transit Dist.*,
   63 Cal.App.4th 280 (1998) ....................................................................11

*Vasquez v. County of Los Angeles*,
   349 F.3d 634 (9th Cir. 2003) .................................................................22

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) ...............................................................21

*Vollmar v. IBM*,
   2012 U.S. Dist. LEXIS 122254 (N.D. Cal. Aug. 28, 2012).....................19

*West v. Scott Labs., Inc.*,
   2023 U.S. Dist. LEXIS 50697 (N.D. Cal. Mar. 24, 2023).......................13

*White v. Ultramar, Inc.*,
   21 Cal.4th 563 (1999) ...........................................................................30

*Williams v. United Airlines, Inc.*,
   2019 U.S. Dist. LEXIS 106308 (N.D. Cal. Jun. 25, 2019)......................17

*Wilson v. Frito-Lay N. Am., Inc.*,
   260 F. Supp. 3d 1202 (N.D. Cal. 2017) .................................................14

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

UNITED'S MOTION FOR SUMMARY JUDGMENT, OR IN ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

*Yanowitz v. L'Oreal USA, Inc.*,
   36 Cal.4th 1028 (2005) ........................................................................... 17

*Yeager v. Corr. Corp. of Am.*,
   944 F.Supp.2d 913 (E.D. Cal. 2013) ........................................................ 17

**Statutes**

2 Cal. Code Regs. § 11065(d)(9)(B) ............................................................. 12

Cal. Gov. Code 12940(n) ............................................................................... 27

Cal. Gov. Code § 12926(j)(1)(B) ................................................................... 12

Cal. Gov. Code § 12926(m)(1)(A) ................................................................. 12

Cal. Gov. Code § 12926(m)(1)(B)(ii) ............................................................ 12

Cal. Gov. Code § 12926(m)(2)(B) ................................................................. 12

Cal. Gov. Code § 12926(m)(5) ...................................................................... 15

**Rules**

Fed. R. Civ. P. 56 (a) .................................................................................... 11

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiff Gladys Salas ("Plaintiff") is a former SFO-based Flight Attendant ("FA") who brings claims against Defendant United Airlines, Inc. ("United") based on her COVID-19 illness ("COVID") from October-December 2020.[1] Plaintiff tested positive on October 29, and United provided her a COVID leave of absence pursuant to a letter agreement ("LOA") between United and her union, the Association of Flight Attendants ("AFA"). Pursuant to the LOA, United provided paid leave to FAs who were required to quarantine or diagnosed with COVID. Plaintiff's initial leave period was scheduled to run through November 9, the anticipated end of her self-isolation. On the day of her anticipated return date, Plaintiff had a virtual visit with her primary care doctor who extended her absence due to "post-viral complications." Plaintiff's physician indicated that she could return to work without restrictions on December 1. United extended her COVID leave to December 1 after it received the doctor's note. In total, Plaintiff was out on paid leave and allegedly unable to work for 36 days.

While still on paid leave, Plaintiff flew on United's aircraft to vacation with friends in Florida from November 20-24 using United's non-revenue leisure pass travel benefit ("pass travel"). At the time, all United passengers were required to certify, among other things, they had not experienced COVID-related symptoms 14 days prior to travel in accordance with Center for Disease Control ("CDC") and Word Health Organization ("WHO") guidance. She affirmatively certified she met the health requirements to travel, including that she did not have a cough.

United's policy with respect to its pass travel benefit is that if an employee is too sick to work, they are too sick to use their free benefits to travel for leisure. If United determines there has been a misuse of the benefit, an employee may be terminated. After Plaintiff returned to work, SFO Performance Supervisor Scott Prickett investigated Plaintiff's leisure travel to Florida. During the

---

[1] Plaintiff's claims must be <u>viewed based on the facts that were known at the time</u>, both in terms of the facts revealed during United's investigation and regarding COVID from a public health perspective, not with the benefit of hindsight based on later public health developments or facts/arguments raised for the first time by Plaintiff during litigation. The events occurred several months after the onset of COVID, after the WHO declared it a pandemic, and the White House declared COVID a public health emergency in March 2020. *See* Declaration of Michele Haydel Gehrke ("Gehrke Decl."), Exs. 36-37. The post-viral complications were not well recognized at the time, and, indeed, guidance from the government about long COVID did not become available generally until July 2021. *Id.*, Ex. 38.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   investigation, whereby Plaintiff's union was present, Plaintiff told Prickett she had no symptoms as of

2   November 17 and went to Florida to see a friend. Prickett concluded, based on what Plaintiff told him

3   during the investigation and her certification that she met the health requirements to travel, that she

4   had improperly used her pass travel benefit to fly to Florida while on paid COVID leave in violation

5   of United policy. Prickett terminated Plaintiff's employment on January 12, 2021.

6          Despite her representation she was symptom-free as of November 17, in this litigation Plaintiff

7   shifted her story and claimed she was suffering from post-viral symptoms, flew to Florida to aid her

8   recovery, and argues United terminated her based on her disability, perceived disability, and age. Her

9   First Amended Complaint ("FAC") alleges: (1) discrimination based on disability/perceived disability

10  and age; (2) harassment based on disability/perceived disability and age; (3) retaliation; (4) failure to

11  engage in the interactive process; (5) failure to provide reasonable accommodation; (6) failure to

12  prevent/investigate/correct; (7) wrongful termination in violation of public policy; and (8) violation of

13  Business and Professional Code section 17200.[2] Her claims cannot survive summary judgment.

14  - ***First***, Plaintiff did not suffer from a disability under the FEHA because her COVID and post-
15       viral complications were mild and transitory. Her illness began around October 26, 2020 and
         she was able to return to work on December 1, 2020 without any restrictions. Plaintiff's illness
16       apparently rendered her unable to work for 36 days and did not otherwise limit a major life
         activity. Because Plaintiff did not suffer from a disability, her disability-related claims fail.

17  - ***Second***, United had legitimate reasons for her termination: her use of pass travel while on paid
         COVID leave and violations of the Working Together Guidelines ("WTG"). United's policy
18       is if an employee is too sick to work, they are too sick to fly for leisure. United had the
         legitimate expectation when Plaintiff was taking a paid leave that she was utilizing the time
19       off for recovery. Instead, she used her travel benefit to visit a friend rather than recover from
         COVID during a critical time - Fall 2020.

20  - ***Third***, Plaintiff's assertions that United discriminated, retaliated, or harassed her based on
21       disability, perceived disability, or age are unsupported. She does not claim to be subjected to
         derogatory disability or age-related remarks and has no evidence suggesting her termination
22       was based on discriminatory/retaliatory animus. She also cannot show United treated her less
         favorably than similarly situated employees. Further, Plaintiff's claims that United failed to
23       accommodate or engage in the interactive process are unsupported because it provided her the
         entirety of the paid leave she requested, and she did not request any other accommodation.

24  - ***Finally***, the Railway Labor Act ("RLA") preempts Plaintiff's claims because they require
25       interpretation of disputed terms in the joint collective bargaining agreement ("JCBA"),
         including the conditions for leave under the LOA, when/if an employee can use pass travel
26       while on paid leave and seek permission to do so, and if United adhered to the JCBA's "just
         cause" and progressive discipline provisions. To determine if United had legitimate bases for
27       termination and to assess pretext, the Court will need to interpret the JCBA, incorporated

28  _____
    [2] The first six claims are under CA Fair Employment & Housing Act ("FEHA"). Gehrke Decl., Ex. 1.

guidelines, and related customs/practices as to pass travel and progressive discipline.

Accordingly, there is no dispute of material fact and United is entitled to summary judgment.

## II. <u>UNDISPUTED MATERIAL FACTS</u>

### A. Plaintiff's Employment.

Plaintiff is a former SFO-based FA. *Id.*, Ex. 2, Plaintiff's Depo. Tr. ("PDT") 33:9-15. She resided in Lorain, Ohio. *Id.*, PDT 25:20-21. Plaintiff would commute from Ohio to SFO using her pass travel to start and end her scheduled work trips at her assigned base. *Id.,* PDT 88:22-25; 89:12-19. Plaintiff was a member of the AFA and the terms and conditions of her employment were governed by the JCBA between United and the AFA. *Id.*, PDT 61:5-8, 14-19; 61:25-62:1-5, 9; *see also* Ex. 11, Response No. 1-2; Ex. 14. Plaintiff's employment was also governed by the WTG, a set of policies that describe the performance and conduct expectations of employees that are incorporated into the JCBA. *Id.*, Ex. 16; *see also* Ex. Declaration of Robert Krabbe ("Krabbe Decl."), ¶¶2-3.

### B. United's Pass Travel Policies

United provides employees at no cost a seat on its airline for travel on a standby basis as a benefit known as "pass travel". *Id.*, Ex. 14; Ex. 2, PDT 78:14-21; 79:18-21. Pass travel is only for business (commuting) or leisure travel. *Id.*, PDT 79:18-21, 85:8-11. The policy states:

> In general, if you're too sick to work, we assume that you're too sick for leisure travel. If you think you're in a situation where leisure travel should be allowed, or you're wondering what you should do, reach out to the Employee Service Center before booking … If you decide to take a trip while on sick leave and it seems inappropriate, we may investigate. And if we find that there was a misuse of your privileges, we may take disciplinary measures ... [and] your job could be at risk. It's always safest to check with your supervisor or the Employee Travel Center … beforehand. *Id.*, Ex. 15, p. 160.

There is no requirement that a FA seek permission to travel while on sick leave. *Id.*, Ex. 10, Krabbe Depo. Tr. 66:11-21. However, under the policy, if an employee is sick, whether at home or elsewhere, they should be recuperating from illness and United may investigate employees who use pass travel while on paid sick leave for potential abuse. *Id.,* Krabbe Depo. Tr. 66:11-67:22; Krabbe Decl., ¶¶4-5. Plaintiff admitted that she was aware of, and familiar with, this policy and understood that it was her responsibility to know and abide by the policy. *Id.*, Ex. 2, PDT 77:24-84:8.

### C. United's COVID Policies and Practices

On March 17, 2020, United entered into the LOA with the AFA. *Id*., Ex. 16; Ex. 10, Tr. 76:23-

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

86:25; *see* Krabbe Decl. ¶6. The LOA provided that a FA who is required to quarantine or diagnosed with COVID will not have to work their scheduled trips and would be paid. *Id.* This was an *additional* paid leave, separate from an employee's regular sick bank, with no attendance points assessed. *Id.* Unlike regular sick calls (which are coded as sick calls or conditional sick), these absences were coded as "Management Drop Pay" or "MDP" on an employee's schedule, a scheduling designation used to drop and pay-protect pairings, without assessment of attendance points. *Id.* MDP had to be entered manually by a member of management or the Flight Attendant Support Team ("FAST"). *Id.*

The JCBA contains call-on/call-off procedures for regular sick leave. *Id.,* ¶7. A FA must notify Scheduling to place herself on sick leave and will automatically remain on sick status until she notifies United she is coming off sick leave --*i.e.*, sick leave "rolls" until she calls off the leave. *Id.* If a FA fails to come off sick leave status within eight hours of an assigned flight, it will be removed automatically by the scheduling software. *See id.,* ¶¶7-8, *see also* Gehrke Decl., Ex. 10, Krabbe Tr. 71:7-73:18; Ex. 5, Petani Depo. Tr. 101:10-102:1; Ex. 3, Prickett Depo. Tr. 180:16-181:8. In contrast, because MDP is a manual scheduling code, MDP does not roll like regular sick leave. *Id.* A FA provided MDP stays on that status until the pre-set MPD period ends at which point the MDP pairing is complete and they could fly in the ordinary course if cleared to return to work. Krabbe Decl., ¶8.

If an employee tested positive, she had to notify United's centralized COVID team so it could gather information, process the absence, and provide direction regarding isolation and submission of documents to United Medical. Gehrke Decl., Ex. 8, Wright Depo. Tr. 28:19-23. United not only had generous COVID leave policies, but its practices were also inconsistent with Plaintiff's suggestion that it was hostile to employees with COVID. ***Indeed, of the 492 SFO Inflight employees who reported COVID from January 2020 to April 2021, United only terminated one employee (Plaintiff) for entirely separate policy infractions***. *Id*., Ex. 10, Krabbe Depo. Tr. 17:21-18:3; Krabbe Decl.,¶13.

During Plaintiff's COVID leave, United required all passengers to complete the "Ready to Fly Checklist" ("Checklist") as part of the check-in process. *See id.*, Ex. 17 . The Checklist stated, "to confirm that you're ready to travel, please review and accept the statements below, which follow Centers for Disease Control and Prevention and World Health Organization Guidelines." *Id.* This Checklist required passengers to confirm, among other things, they did not have COVID-related

symptoms such as cough, fever, chills, muscle pain, shortness of breath, etc., in the last 14 days. *Id.*

**D. Absence from Work in October to December 2020 and Travels to Florida.**

**1.      Initial Absence from Work in October to November 2020.**

Plaintiff tested for COVID on October 26, and received a positive result on October 29. *Id.*, PDT 95:12-15; 96:6-7; 122:2-9; 127:8-12. Plaintiff notified United's centralized COVID team (employees who assisted the Scheduling and Medical departments in supporting employees during the Pandemic) and spoke to Joanna Wright. *Id.*, PDT 127:13-15; *see also*, Ex. 8, Wright Depo. Tr. 12:7-22. Prior to her COVID infection, Plaintiff had a reserve line for the month of November, which meant that she did not have set flights and would be on-call during days she was assigned reserve. *Id.*, Ex. 22-23, Ex. 2, PDT 36:20-37:25; Krabbe Decl., ¶¶9-10. When Plaintiff reported her COVID diagnosis, United converted her reserve days to MDP through November 11 because her reserve days from this period were on November 1-6 and 8-11. *See* Ex., 23; *see also* Krabbe Decl., ¶10. From October 29 to November 11, Plaintiff was not required to work or be on call, no attendance points were assessed, and she was paid for the days she was scheduled to be on reserve. *Id.*, Ex. 18; *see also* Ex. 2, PDT 132:20-133:18; Krabbe Decl., ¶6; 10. Plaintiff understood she would be taken off the schedule and paid for the days she was scheduled to be on reserve. Gehrke Decl., Ex. 2, PDT 132:20-133:18.

While Plaintiff was in isolation, her local health department regularly contacted her regarding her symptoms.[3] *Id.*, PDT 139:1-3; 140:4-13; *see also* Ex. 11, Response to No. 14. Plaintiff reported her symptomatology to the county including: November 8 - cough and fatigue; November 9 - cough, fatigue and a "little light-headed like [her] head is foggy"; November 11 - cough, fatigue, dizziness and brain fog; November 13 - fatigue and cough; November 16 - cough; November 17 - cough, chest pain and that she was getting better. *Id.*, Ex. 2, PDT 150:23-153:5; *see also* Ex. 19.

**2.      United Extends Plaintiff's Paid Leave Until December 1, 2020.**

Plaintiff's proscribed quarantine period was set to end on November 9 under then-existing CDC guidelines. *Id.*, Ex. 20. Plaintiff received a communication from United's Employee Service Center around November 6 outlining the steps required to return to work. *Id.*, Ex. 2, PDT 154:18-155:7. The communication from United and the attached paperwork stated that Plaintiff could either

---

[3] United later learned this through discovery and not known to it at the time of her termination.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   submit two negative tests or a clearance note from her doctor to return to work. *Id.*, Ex. 20.

2   On November 9, Plaintiff virtually consulted her primary care physician, Dr. Ilona Jurek. *Id.*,

3   Ex. 2, PDT 102:24-25; *see also* Ex. 21. Dr. Jurek extended her absence to December 1 because it

4   would "take a couple weeks" for her brain fog, fatigue, and cough to clear and that she "should be

5   fine." *Id.*, Ex. 2, PDT 158:17-149:2. Dr. Jurek wrote Plaintiff could return to work <u>without restrictions</u>

6   on December 1. *Id.*, PDT 159:20-160:5; 182:3-9; *see also* Ex. 35. Plaintiff speculated Dr. Jurek faxed

7   documentation to United on November 9 but admitted she did not know what she faxed over. *Id.*, Ex.

8   2, PDT 156:19-157:8. The same day, Plaintiff's supervisor, Juliana Petani, called Plaintiff regarding

9   her return to work. Plaintiff told Petani that her doctor would be extending her absence until December

10  1. *Id.*, Ex. 2, PDT 169:10-18; 169:25-170:8. Thereafter, United contacted Plaintiff the following day

11  stating that they had not received a doctor's note extending her leave, so she requested that Dr. Jurek

12  resend it. *Id.*, PDT 167:7-168:12. Dr. Jurek's records show that she did not fax records to United

13  extending Plaintiff's leave until November 12. *Id.*, Ex. 21; Ex. 4, Jurek Depo. Tr. 97:7-99:25.

14  On November 12, United's automated system added a reserve standby assignment to Plaintiff's

15  schedule for the next day. *Id.*, PDT 185:25-186:4; 188:1-15; *see also* Ex. 22-23; Krabbe Decl., ¶¶9-

16  10. This occurred because at the time of the assignment, United had not yet received a note extending

17  Plaintiff's leave and her MDP status. *See id.*, Ex. 19; Ex. 22-23; Ex. 5, Petani Depo. Tr. 30:10-17;

18  101:10-102:1; Ex. 3, Prickett Depo. Tr. 180:16-181; Krabbe Decl. ¶10. Indeed, the evidence shows

19  that United did not receive the doctor's note until November 12 and Scheduling did not process the

20  MDP change until November 13. *Id.*, Ex. 21; Ex. 13. Upon learning of the November 13 assignment,

21  Plaintiff called Scheduling to tell them she was out until December 1. *Id.,* Ex. 2, PDT 186:18-187:3;

22  188:1-15. Plaintiff testified that on November 12, she called Petani and Joanna Wright (COVID team)

23  and left both a message regarding the reserve assignment and stated that she had placed herself out on

24  sick leave. *Id.*, PDT 193:19-194:10; 196:15-21; 197:8-25. She testified that Petani called her back the

25  same day and stated that if the automated system scheduled her, to call off sick to protect the operation

26  (i.e., to notify United she was out sick so that it was not expecting her to appear and could assign the

27  flight to someone else), and that United would fix it later. *Id.*, PDT 197:18-198:16; Krabbe Decl.,¶7.

28

Plaintiff testified she spoke with Wright the evening of November 12 and that Wright told her that United granted her leave until December 1 per her doctor's note. *Id.*, Ex. 2, PDT 185:1-23, 194:11-24.

On November 13, Scheduling called Plaintiff to ask if she wanted to be assigned a China pairing. *Id.*, PDT 186:12-17; 200:16-25. Plaintiff told Scheduling she was not on standby and called the prior day that she was out until December 1. *Id.*, PDT. Plaintiff called Petani and Wright on November 13 regarding the China pairing. *Id.*, PDT 200:9-202:13. Wright did not return her call. Petani spoke to her the same day and explained Wright would take care of any flights inadvertently assigned to her before December 1. *Id.*, PDT 201:11-202:1; *see also* Ex. 24. Plaintiff admitted the China pairing was ultimately never assigned to her. *Id.,* PDT 201:11-202:1. In fact, Plaintiff testified she was not required to work through December 1, no one tried to assign her flights after November 13, and she was paid for her time off. *Id.*, Ex. 2, PDT 191:22-25; 193:5-18; Krabbe Decl., ¶10.

Plaintiff testified that Petani called her on November 18 and asked how she was feeling. *Id.*, PDT 207:4-208:9; Ex. 24. During the conversation Plaintiff told Petani that she was still in quarantine and "was getting better". *Id.*, Ex. 2, PDT 207:14-15. Later that day, the Lorain County Department of Health contacted Plaintiff and released her from quarantine. *Id.*, PDT 148:18-149:1-7; 153:6-9.

**3.      While on Paid Leave, Plaintiff Uses Pass Travel to Take a Vacation to Florida.**

Plaintiff did not attempt to return to work after being released from quarantine by Lorain County. Rather, on November 19, 2020, Plaintiff booked a trip to Florida using her pass travel, and on November 20 flew from Ohio to Florida; and returned on November 24. *Id.*, PDT 230:22-232:25; *see also* Ex. 11, Response No. 4. She testified she went to Florida "for her recovery" and to visit a friend. *Id.,* Ex. 2, PDT 235:19-236:6. Plaintiff testified that she was experiencing fatigue and brain fog while in Florida. *Id.,* PDT 237:14-22. However, Plaintiff was able to be out between 3-6 hours a day, engaging in activities like walks and visiting the beach. *Id.,* PDT 239:13-240:10, 243:15-20. Plaintiff testified the trip to Florida "helped [her] mental position" because "quarantine ... just made [her] sad". *Id.,* PDT 241:16-242:19. No medical doctor advised her to travel to Florida to aid in her mental health, fatigue, or COVID symptoms. *Id.,* PDT 242:20-243:14. There is no evidence depression or any mental health condition was part of Plaintiff's post-viral complications. *See e.g.*, Ex. 12, Plaintiff's Response No. 23. Furthermore, Plaintiff admitted she did not visit a heath care provider while in Florida. *Id.,*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Ex. 2, PDT 238:7. Plaintiff admitted she did not seek permission from United to use her benefits to fly to Florida but also claims she was not required to. *Id.,* PDT 223:14-23; Ex. 11, Response No. 5.

**4.    Plaintiff Misrepresents Her Condition so She Can Board Her Free Flight In Violation of United Policy and Guidance of Health Authorities**

While checking-in for her flights to/from Florida, Plaintiff had to complete the Checklist and certify she did not have COVID-related symptoms in the last 14 days. *Id.,* Ex. 2, PDT 244:5-246:7. Plaintiff admitted that she certified that she did not have any COVID symptoms prior to flying. *Id.*; *see also* Ex. 11, Response No. 6. Plaintiff testified, however, she was still experiencing a cough at the time and pain in her right shoulder. *Id.,* Ex. 2, PDT 250:13-251:1; *see also* Exs. 19; 21 . Had Plaintiff accurately reported her symptoms on the Checklist, United would not have allowed her to fly since the Checklist indicated anyone that does not meet the criteria should reschedule. *See id.*, Ex. 17; 39.

**5.    Plaintiff Is Cleared to Return to Work on December 1 Without Restrictions.**

When Plaintiff returned in December, she was no longer on reserve. *See id.*, Ex. 2, PDT 36:20-37:25. On December 1, she picked up a pairing for December 2-5. *Id.,* Ex. 22-23. However, the automatic scheduling system removed the flight for December 2 because on November 12, when Plaintiff called in sick, United's system coded her as on a conditional sick leave which continued to roll until she called off sick leave. *See id.,* Ex. 22-23; Ex. 7, White Tr. 228:1-22; 265:3-14; Ex. 2, PDT 194:6-10; 196:7:9; Krabbe Decl., ¶11. Indeed, Plaintiff did not communicate her December 1 return to work to United Medical, HR, or the Employee Service Center. *Id.,* Ex. 2, PDT 264:2-12. Nevertheless, United paid her for the trip she was scheduled to fly. *Id.,* PDT 265:18-266:4.

By December 4, Plaintiff's sick leave status was updated and removed by Scheduling. *Id.,* Ex. 22-23; Krabbe Decl., ¶11. Indeed, Plaintiff admitted, thereafter, she was able to pick up and fly trips in December. *Id.*, Ex. 2, PDT 214:3-14. She worked on December 4-5, 8, and 11-12. *Id.,* PDT 266:8-267:13. She admits that except for her automated removal from the December 2 trip, for which she was paid, she was able to return to work in December without any problems. *Id.,* PDT 267:14-17.

For December 2020, Plaintiff selected a No-Activity-Line ("NAL"). *Id.,* PDT 36:20-37:25. A NAL was an empty line (no assigned flying), but a FA who selected a NAL could pick up to 35 hours of trips through United's trip trading system. Krabbe Decl., ¶12. NAL was a furlough mitigation measure. *Id.* Although Plaintiff testified she bid for NAL because she felt a full schedule may be too

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    exhausting, she admitted her doctor returned her to work on December 1 <u>without restrictions</u> (Gehrke

2    Decl., Ex. 2, PDT 269:14-25; Ex. 35); she had not requested any accommodation for her return in

3    December or after (*Id.*, PDT 160:2-5); and United allowed her to be part of a NAL. *Id.,* PDT 270:1-7.

### E.  United Conducts an Investigation Under the JCBA.

5           Around December 10, United's centralized COVID team became aware that Plaintiff had

6    flown several pairings, but it was unclear to them whether she had been medically cleared to return to

7    work because the team did not have a formal clearance. *Id.,* Ex. 25. At the time, to return to work,

8    Plaintiff needed to submit medical documentation she was cleared or submit two negative tests. *Id.*,

9    Ex. 20. Mark Jacobs, an employee on the COVID team, subsequently reached out to United Medical

10   and the SFO base, including FA supervisors Petani and Brian Castelli, to determine if she had flown

11   any trips without medical clearance. *Id.*, Ex. 25. Petani and Castelli looked at her pass travel because

12   they were concerned that, as a commuter from Ohio to SFO, she had flown from her home to the SFO

13   base and did not know if she was still with COVID or cleared to return. *Id.,* Ex. 9, Castelli Depo. Tr.

14   38:2-20; Ex. 5, Petani Depo. Tr. 48:15-49:6; 50:8-18; 112:8-15. When Petani and Castelli looked at

15   Plaintiff's travel history to see what, if any, trips she had recently worked or was scheduled to work

16   and the potential impact of her having done so, they could see that she used her pass travel while out

17   on paid COVID leave to fly to Florida.[4] *Id.,* Castelli Depo. Tr. 99:21-100:4; *see also* Petani Depo. Tr.

18   109:20-25. It was later determined by Medical that Plaintiff had been cleared to return and she did not

19   submit negative testing, however, her use of pass travel while absent on a paid COVID leave prompted

20   an investigation. *Id.,* Ex. 26; *see also* Ex. 5, Petani Depo. Tr. 115:22-116:5. Prickett conducted the

21   investigation, as he was responsible for investigating FAs whose conduct may lead to termination. *Id.,*

22   Ex. 3, Prickett Depo. Tr. 132:22-133:5. Plaintiff did not know Prickett, nor did Prickett know Plaintiff,

23   prior to the investigation. *Id.,* Ex. 2, PDT 249:7-24; *see also* Ex. 3, Prickett Depo. Tr. 131:19-21.

24          The employee investigatory process is outlined and governed by the JCBA. *Id.*, Ex. 13; Ex. 10,

25   Krabbe Depo. Tr. 43:17-21. Pursuant to the JCBA, United issued Plaintiff a Letter of Investigation

26   ("LOI") on December 21. *Id.,* Ex. 2, PDT 274:2-4. The LOI stated Plaintiff was being investigated for

27   non-revenue pleasure pass use in November while she was on COVID leave as well as her certification

28   _____

[4] A pass travel report shows leisure flights in addition to commuting flights. *Id.*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

on the Checklist that she was not symptomatic with COVID. *Id.,* Ex. 27. The investigation meeting occurred on December 23 between Prickett, Plaintiff and her AFA representative (Kaitlin White), and Castelli. *Id.,* Ex. 2, PDT 274:10; Ex. 11, Responses No. 9, 10. During the meeting, Plaintiff stated she traveled to Florida to visit a friend and that she was "good to travel" on November 20 because her COVID symptoms ended by November 17, 2020. *Id.,* Ex. 2, PDT 247:12-19, 248:19-249; 256:12-21. Plaintiff submitted a written statement that contained the same information. *Id.,* Ex. 28; Ex. 2, PDT 246:13-21**.** When Pricket asked Plaintiff why she travelled to Florida while on paid COVID leave given her physician's representation that she would be out sick until December 1, Plaintiff stated that she was cleared from quarantine and symptom free on November 18. *Id.*, Ex. 2, PDT 256:22-257:8. After the meeting, on December 29, 2020, Plaintiff sent a doctor's note to Prickett stating:

> "The above patient of mine was diagnosed with COVID-19 on 10/26/20. She was no longer contagious and released to work on 11/9/2020. She then contacted me as she was having difficulties thinking and with fatigue and I felt that she had a post viral syndrome that could make it dangerous for her to function as a flight attendant. I released her back to work without restrictions on 112 [sic]/1/2020 after her symptoms had resolved". *Id.,* Ex. 29.

### F. United Concludes Plaintiff Violated its Policies and Terminates Her Employment.

Prickett's investigation revealed that Plaintiff used pass travel while on paid COVID leave, Plaintiff no longer had symptoms by November 18, flew to Florida to visit a friend[5], and should have informed United she was able to return to work on November 18 when released and no longer experiencing symptoms. *Id.,* Ex. 3, Prickett Depo. Tr. 95:12-97:16, 200:16-207:4, 212:19-213:3; Ex. 30. Based on these facts presented to him at the time, Prickett concluded that Plaintiff engaged in knowing misuse of her pass travel benefits, and improperly remained on paid COVID leave long after her symptoms ended. Plaintiff should have communicated to United that her symptoms had ended and that she was available to work. *Id.,* Ex. 31; Ex. 3, Prickett Depo. Tr. 225:2-12. Prickett found that this conduct violated the WTG's provisions relating to professionalism, responsibility, and honesty and terminated Plaintiff's employment. *Id.,* Ex. 3, Prickett Depo. Tr. 266:7-20, 267:1-277:6; Ex. 31. Prickett's termination decision is in line with United's practice of consistently terminating SFO-based

---

[5] At the time, the CDC advised against travel if a traveler had COVID symptoms or felt sick. *See* Gehrke Decl., Ex. 39.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

FAs who abuse sick leave by using pass travel while on leave for illness. *Id.*, Ex. 3, Prickett Depo. Tr. 186:14-24; 225:23-226:13; White Depo. Tr. 54:1-10; Krabbe Depo. Tr. 17:21-18:3.

On January 12, 2021, Prickett held a second meeting with Plaintiff, Miriam Swineheart (SFO supervisor), and White. *Id.*, Ex. 2, PDT 288:5-9; White Depo. Tr. 180:25-181:2. At that meeting, Prickett conveyed his termination decision, the grounds for which he summarized in Plaintiff's termination letter.[6] *Id.,* Ex 3, Prickett Depo. Tr. 266:7-20; 267:1-277:6; Ex. 31.

### G. Plaintiff Grieves Her Termination Under the JCBA

Plaintiff filed a grievance contesting her termination under the JCBA. *Id.,* Ex. 7, White Depo. Tr. 48:24-49:8. On February 24, 2021, Plaintiff attended an Appeal Hearing with White. *Id.,* Ex. 32. Nancy ByunRiedel (SFO Inflight Base Operations Director) was the hearing officer for the Appeal. On March 3, she concluded that there were no violations of the JCBA that warranted reversal of the termination. *Id.,* White Depo. Tr. 49:20-22, ByunRiedel Depo. Tr: 109:1-19, Ex. 32. Plaintiff further appealed her grievance but eventually abandoned it on October 11, 2023. *Id.*, Ex. 33.

### III. <u>ARGUMENT</u>[7]

### A. Plaintiff's Discrimination and Retaliation Claims Fail as a Matter of Law.[8]

Where a plaintiff lacks direct evidence of discrimination, the Court will apply the *McDonnell Douglas* burden-shifting framework. *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000). Under this

---

[6] As part of the termination review process, United created a Disciplinary Review Panel ("DRP") that included Human Resources, Legal, and Labor Relations, to counsel and guide the supervisor on employee discipline. *Id.,* Ex. 6, ByunRiedel Depo. Tr. 18:20-20:24; Ex. 3, Prickett Depo. Tr. 197:10-17; Ex. 10, Krabbe Depo. Tr. 44:4-45:7. But the supervisor (here, Prickett) made the decision. *Id.*

[7] Summary judgment is proper when the movant shows there are no genuine disputes of material fact. FED.R.CIV.P. 56 (a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the movant establishes the absence of any genuine issue, the burden shifts to the nonmovant to produce evidence of a genuine issue for trial. *Id.* at 321-25. Plaintiff's burden is not met by identifying speculative doubt as to the material facts by conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("Mere allegation and speculation do not create a factual dispute for purposes of summary judgment."); *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) ("A mere scintilla of evidence supporting the non-moving party's position is insufficient"). A defendant may show it is entitled to summary judgment by submitting evidence negating a material element of the claim or showing the absence of evidence to support an essential element of the claim. *Celotex*, 477 U.S. at 322-25.

[8] Plaintiff's failure to prevent, wrongful termination, and Business and Profession Code claims are derivative and subject to summary judgment. Plaintiff cannot maintain her "failure to prevent" claim if no discrimination, harassment, or retaliation occurred. *Trujillo v. N. Cty. Transit Dist.*, 63 Cal.App.4th 280, 286, 289 (1998). Further, United had robust anti-discrimination, harassment, and retaliation policies and trained employees on them (Krabbe Decl., ¶3), but Plaintiff failed to utilize them. Gehrke Decl., Ex 2; PDT 58:9-21, 69:16-71:5; 71:7-74:15, 74:22-75:16. This demonstrates that United took reasonable steps to prevent discrimination, harassment, or retaliation. Plaintiff's wrongful

framework, the Plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 354-55. Only then would the burden shift to United to articulate a legitimate ground for its action. *Id.* at 355-56. Thereafter, the burden shifts to Plaintiff to show the reason was pretextual. *Id.* The ultimate burden of proof remains with plaintiff to show intentional discrimination because of her protected status. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). Here, the undisputed record shows there is no direct evidence of discrimination and, thus, the *McDonnell Douglas* test applies. Applying *McDonnell Douglas*, Plaintiff cannot state a *prima facie* case of discrimination and, ***even if*** she could, United had legitimate non-pretextual grounds for termination.

### 1. Disability Discrimination

To establish a *prima facie* case of disability discrimination, Plaintiff must prove she: (1) suffered from a disability; (2) was otherwise qualified to do her job; and (3) was subjected to an adverse employment action *because of* her disability. *Alamillo v. BNSF Ry.*, 869 F.3d 916, 920 (9th Cir. 2017). Plaintiff cannot establish the first and third elements of her claim.

### a. Plaintiff's Discrimination Claim Fails as She Did Not Have a Disability under FEHA.

Plaintiff's disability claims are based <u>only</u> on her COVID diagnosis and post-viral COVID symptoms. Gehrke Decl., Ex. 2, PDT 92:18-92:25; 93:1-7; 94:3-95:4. However, Plaintiff's short-lived COVID condition does not qualify as a disability.[9] The FEHA defines a physical disability as a condition that affects one or more body systems and it must limit a major life activity. Cal. Govt. Code § 12926(m)(1)(A), (m)(2)(B). A condition limits a major life activity if it makes the achievement of the major life activity difficult. *Id.* § 12926(j)(1)(B), (m)(1)(B)(ii). A disability is not a condition that is mild or does not limit a major life activity. 2 Cal. Code Regs. § 11065(d)(9)(B).

---

termination and Section 17200 claims are likewise subject to summary judgment because her underlying FEHA claims fail. *Shinde v. Coffman Engineers, Inc.*, 584 F. App'x 398, 399 (9th Cir. 2014) (affirming summary judgment on wrongful termination claims premised on violation of FEHA's anti-discrimination policy where FEHA claim failed); *Price v. Starbucks Corp.*, 192 Cal.App.4th 1136, 1147 (2011) ("Because the underlying causes of action fail, the derivative . . . claims also fail.").
[9] Propensity for reinfection is not a disability. *See Cleveland v. Waste Mgmt.*, 1999 U.S. Dist. LEXIS 1389, *14-15 (N.D. Cal. Feb. 1, 1999) ("as a matter of law, such an "at risk" condition does not equate to a disability under the ADA"); *Newell v. State Univ. of N.Y. Westchester Cmty. Coll.*, 2023 U.S. Dist. LEXIS 105901, *9-10 (S.D.N.Y. Jun. 20 2023) ("Even if she was perceived of being at risk of developing COVID-19 in the future, that would not plausibly state an ADA claim"); *Earl v. Good Samaritan Hosp. of Suffern*, 2021 U.S. Dist. LEXIS 186182, *6 (S.D.N.Y. Sept. 28, 2021) ("perception of infectiousness is not the same as perceived disability").

UNITED'S MOTION FOR SUMMARY JUDGMENT, OR IN ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Courts in this circuit have held COVID does not typically constitute a disability. *Areopaja v.*

2 *Morrison Mgmt. Specialists*, 2023 U.S. Dist. LEXIS 43949, *11-14 (C.D. Cal. Mar. 14, 2023) ("This

3 Court holds [] that COVID does not qualify as a disability under FEHA."); *West v. Scott Labs., Inc.*,

4 2023 U.S. Dist. LEXIS 50697, *8 (N.D. Cal. Mar. 24, 2023) ("Federal courts have consistently held

5 that COVID-19 is 'transitory and minor'"); *Lundstrom v. Contra Costa Health Servs.*, 2022 U.S. Dist.

6 LEXIS 214812, *10-11 (N.D. Cal. Nov. 29, 2022) ("The Court agrees that having COVID is generally

7 "transitory" and therefore not a disability under the ADA.").

8    Plaintiff states the conditions constituting her disability were "lightheadedness, brain fog,

9 inability to concentrate, to cope with multi-step activities or situations with effects on short term

10 memory." Gehrke Decl., Ex. 12, Response No. 23. Plaintiff's symptoms were mild and transitory such

11 that they did not limit a major life activity for several reasons:

- Plaintiff tested positive for COVID on October 29, and had recovered from most of her COVID complications such that she was sufficiently well enough to return to work without restrictions on December 1. *Id.*, Ex. 2, PDT 99:9-18; Ex. 35. *See e.g., Roman v. Hertz Local Edition Corp.*, 2022 U.S. Dist. LEXIS 88154, *14 (S.D. Cal May 16 2022) ("Roman did experience fatigue, body aches, headache, and cough, these symptoms were mild enough that she was able to work and carry out her duties ... suggests that her COVID-19 infection was "mild" under [FEHA]").

- While she stated that her COVID diagnosis rendered her bedridden, with slurred speech, unable to eat, fatigued, and that she could not bathe herself or walk, the worst of these symptoms were in the ***first five days*** and then she began to improve. Gehrke Decl., Ex. 2, PDT 97:19-99:8.

- The symptoms were so mild she did not seek medical consultation for her COVID symptoms until November 9, 2020, ***after*** United requested return to work documentation from her. *Id.*, PDT 97:11-14. Plaintiff testified that when she first saw Dr. Jurek on November 9, her doctor stated it would only take a "couple weeks" for her brain fog, fatigue, and cough to clear and she "should be fine." *Id.*, PDT 158:17-149:2. Besides the single virtual meeting on November 9, 2020, Plaintiff did not otherwise seek any treatment. *See id.*, Ex. 12, Response No. 34. *See e.g., Cenis v. Winco Holdings, Inc.*, 2018 U.S. Dist. LEXIS 89301, *14-15 (E.D. Cal. May 25, 2018) (a temporary ailment where plaintiff did not take medication for it, did not seek treatment, and where plaintiff was able to return after without incident is "precisely the type of mild, temporary condition … that fails to qualify as a disability under FEHA.").

- Plaintiff testified she never required hospitalization nor was she prescribed medications besides multivitamins. Gehrke Decl., Ex. 2, PDT 100:13-101:3, 147, Ex. 4, Jurek Depo. Tr. 82:11-20 (her doctor testified that she was not prescribed any medication).

Moreover, her doctor cleared her to return to work ***without restrictions*** on December 1, 2020.

*Id.*, Ex. 2, PDT 100:2-8; *see also* Ex. 4, Jurek Depo. Tr. 93:1-7; Ex. 35. ***Even if*** she continued to suffer

from complications after she was cleared from quarantine, these symptoms were mild enough that she

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

was able to return to work on December 1 without restrictions and carry out her duties. *See e.g.*, *Areopaja*, 2023 U.S. Dist. LEXIS 43949, *13 ("Plaintiff was unable to work for only a short period of time … from July 13, 2020, through July 25, 2020 … the duration and symptoms of Plaintiff's COVID-19 infection do not rise to the level of a disability under FEHA."). Plaintiff admitted by December 1, even though she still felt she had fatigue and brain fog, "[i]t had improved" and she felt she could safely return to work. *Id.*, Ex. 2, PDT 264:22-265:10. Indeed, Plaintiff was well enough to work on December 4-5, 8, and 11-12. *Id.*, PDT 266:8-267:13. When Plaintiff saw Dr. Jurek for a second time on December 23, Dr. Jurek noted her post-viral syndrome was resolved. *Id.*, PDT 175:19-24; *see also* Ex. 4, Jurek Depo. Tr. 114:1-7. Plaintiff admitted she agreed with her doctor's assessment because her post-viral symptoms had "improved dramatically". *Id.*, Ex. 2, PDT 175:19-24.

Plaintiff does not claim long-term or permanent effects. Plaintiff admitted in her deposition that her COVID symptoms and-post viral complications resolved by December 2020-January 2021. *Id.*, PDT 99:9-12. Despite admitting her symptoms were resolved by then, Plaintiff later sought to contradict this testimony in written discovery by claiming she had lingering symptoms past this time with no explanation. *See id.*, Ex. 12, Responses No. 24-33; *Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1212 (N.D. Cal. 2017) (a party cannot create a dispute of material fact by providing interrogatory responses and affidavits that contradicted earlier sworn testimony with no explanation for contradiction). Even if the Court credits her attorney-drafted discovery responses, her responses and sworn deposition testimony that she was well enough to work would not transform her illness into a disability. Plaintiff's COVID and post-viral condition which, at most, lasted 36 days until she was well enough to return to work, is sufficiently mild and transitory such that Plaintiff does not qualify as having a disability that limited a major life activity. And courts have repeatedly held that COVID symptoms of the nature and duration that Plaintiff claims persisted into January-February 2021 (fatigue, brain fog, lightheadedness) are not a disability. *See Coleman v. Child.'s Hosp. of Phila.*, 2023 U.S. Dist. LEXIS 201275, *14 (E.D. Pa. Nov. 8, 2023) (granting summary judgment because a plaintiff alleged lingering COVID, but whose symptoms were cough, fatigue, and "COVID fog" between December 2020 to February 2021 that resolved weeks prior to termination, did not plausibly establish she suffered a disability under the ADA); *Drepaul v. Wells Fargo Bank, N.A.,* 2024 U.S.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Dist. LEXIS 5851, *13 (D.Conn. Jan. 11, 2024) (granting dismissal because a plaintiff that suffered aches, coughing, headaches, chills, lightheadedness, loss of taste and smell, and brain fog for one month but able to return without accommodation did not plausibly allege a disability under ADA).

**b.  Plaintiff's "Regarded As" Claim Fails Because There is No Evidence That the Decisionmaker Perceived Her as Having a Disabling Condition.**

The FEHA includes in its definition of physical disability "[b]eing regarded or treated by the employer as having, or having had, a disease . . . that has no present disabling effect but may become a physical disability." Cal. Gov. Code § 12926(m)(5). "To prove that an ailment may become a physical disability, evidence must be produced showing the employer acted in such a way to indicate that it believed an ailment to be potentially disabling." *Ross v. County of Riverside,* 36 Cal. App. 5th 580, 595 (2019). Because COVID is not a disability, the perception Plaintiff had COVID or may be reinfected with it in the future cannot be the basis for a regarded as claim. *Lundstrom*, 2022 U.S. Dist. LEXIS 214812, *10-11 ("Being perceived of as having COVID-19 is [] also not a disability under the ADA."); *Monegas v. City of San Francisco Dep't of Pub. Health*, 2023 U.S. Dist. LEXIS 155590, *6-7 (N.D. Cal. Sep. 1, 2023) (same). ***Even if*** her condition is a disability, there is no evidence anyone at United made comments to Plaintiff regarding her as disabled or United believed she had a disabling condition. Indeed, United was ready to return and did return Plaintiff to work in early December 2020 before the investigation into her pass travel even began. *See* Gehrke Decl., Ex. 2, PDT 266:8-267.

**c.  There is No Evidence Plaintiff was Terminated "Because Of" Her Alleged Disability.**

There is no evidence that Prickett or anyone else at United fired Plaintiff *because of* her disability. *Id.*, PDT 285:10-287:2. Plaintiff was terminated because of her violation of United's policies and using pass travel while on a paid absence for COVID during the height of the Pandemic. The facts known at the time of the investigation were Plaintiff's paid COVID leave was extended to December 1, but she said her symptoms stopped by November 17, and she used pass travel to visit a friend from November 20-24 while still being paid to recuperate from COVID. This led Prickett to reasonably determine that Plaintiff violated policies. *Id.*, Ex. 3, Prickett Depo. Tr. 200:16-207:4. Whether or not that conclusion was ultimately accurate is not the point. ***Even assuming*** Plaintiff mentioned she had fatigue and brain fog and later provided Prickett a note from her doctor she was suffering from post-viral complications, those excuses were inconsistent with what she told Prickett

originally *during* the investigation. Prickett reasonably concluded Plaintiff violated policy which formed legitimate grounds for termination. Conversely, Plaintiff cannot point to any evidence suggesting the decisionmaker or anyone else at United was motivated by her claimed disability. *Rund v. Charter Communs., Inc.*, 2007 U.S. Dist. LEXIS 19707, *20 (E.D. Cal. Mar. 20, 2007) (plaintiff "proffers no evidence that his termination was *because* of his claimed disability. As plaintiff cannot establish all of the requisite elements of a *prima facie* case, the court must grant summary judgment").

### 2. Plaintiff Has No Evidence Raising an Inference of Age-Based Motive for Termination.

To establish a *prima facie* case of age discrimination, Plaintiff must show she was (1) over the age of forty; (2) performing her job satisfactorily, (3) discharged, and (4) replaced by substantially younger employees with equal or inferior qualifications or under circumstances otherwise giving rise to an inference of discrimination. *Merrick v. Hilton Worldwide*, 867 F.3d 1139, 1146 (9th Cir. 2017).

Plaintiff cannot satisfy the second and fourth elements. As to the second element, she was not performing her work satisfactorily because she had been found to have violated United's rules and expectations relating to using pass travel while on sick leave and WTG guidelines through her conduct and travels to Florida. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1208 (9th Cir. 2008) (holding that "no reasonable juror could find that [plaintiff's] performance was satisfactory" where she violated company policy). From January 2020 to April 2021, out of the 492 SFO Inflight employees that contracted COVID, a majority were over age 40 and she was the only one terminated, not because she was absent due to COVID, but based on the determination she misused pass travel. *Id.*, Ex. 10, Krabbe Depo. Tr. 17:21-18:3*; see also* Krabbe Decl. ¶13. As to the fourth element, while Plaintiff was 58 years old at termination, there is no evidence she was replaced by substantially younger employees with equal or inferior qualifications, or the circumstances of her discharge raised an inference of discrimination. *See* Gehrke Decl., Ex. 2, PDT 25:18-19. Indeed, she admitted she could not recall any age-based comments or being treated differently because of her age. *Id.*, PDT 184:10-13; 287:7-20; 295:3-4. There is no causal nexus between her termination and age, and as described above, she was terminated for violation of United's policy and pass travel misuse. In sum, the record is devoid of facts to show United's conduct raises an inference of age discrimination.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

### 3. Retaliation Claim

To state a claim for retaliation, Plaintiff must show: (1) she engaged in protected activity; (2) retaliatory animus on the part of the employer; (3) an adverse action; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and (6) causation. *Yeager v. Corr. Corp. of Am.*, 944 F.Supp.2d 913, 924 (E.D. Cal. 2013). An "unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a *prima facie* case of retaliation". *Yanowitz v. L'Oreal USA, Inc*., 36 Cal.4th 1028, 1046-47 (2005).

Here, there is no evidence of a causal link between any purported activity and her termination. Plaintiff testified that her retaliation claim is based on her termination, which she alleges was discriminatory, and she was not aware of any other conduct prior to her termination that she would consider retaliatory. *See* Gehrke Decl. Ex. 2, PDT 75:20-21, 75:24, 76:1-3, 76:6. Plaintiff's only protected activity she can identify is requesting and taking a COVID leave (which was granted and extended by United), and she admits that she never made a complaint about discrimination or retaliation prior to or after her termination.[10] *See* Gehrke Decl., Ex. 2, PDT 71:7-74:15, 74:22-75:16; *Rope v. Auto-Chlor Sys. of Washington, Inc.,* 163 Cal.App.4th 635, 652-653 (2013) (to constitute protected activity must be "some degree of opposition to . . . the employer's conduct or practices based on the employee's reasonable belief that the employer's action or practice is unlawful.").

Further, Plaintiff cannot establish a link between any protected activity (taking COVID leave) and her termination because she was fired for violation of United's policies and using her pass travel while on a paid absence. *Id.*, Ex. 31; Ex. Prickett Depo. Tr. 47:25-50:17, 200:16-207:4; *Williams v. United Airlines, Inc.*, 2019 U.S. Dist. LEXIS 106308, *25-26 (N.D. Cal. Jun. 25, 2019) (granting summary judgment on FEHA retaliation claim because plaintiff "has not presented evidence from which a rational finder of fact could determine that her termination was based on wrongful motivations"). The evidence known during the investigation was Plaintiff's paid leave was extended to December 1, she said her symptoms stopped by November 17, and she used pass travel to visit a

---

[10] Plaintiff was trained on United's anti-discrimination, harassment, retaliation policies and reporting procedures, yet never utilized them in October 2020-January 2021. Gehrke Decl., Ex. 2, PDT 58:9-21, 69:16-71:5- 74:15, 74:22-75:16.

UNITED'S MOTION FOR SUMMARY JUDGMENT, OR IN ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   friend from November 20-24 while still being paid to recuperate from COVID. *Id.*, Ex. 3, Prickett Tr.

2   200:16-207:4. There is no evidence United retaliated against Plaintiff *because* she took leave.

### B.  Plaintiff's Discrimination and Retaliation Claims Fail Because United Had Legitimate Non-Discriminatory and Non-Retaliatory Grounds for Termination.

*Even if* Plaintiff could state a *prima facie* case, her claims for discrimination and retaliation

fail because United had legitimate grounds for termination. The termination was based on legitimate

bases detailed in the termination letter: her false claim of sick leave and violations of the WTG. Gehrke

Decl., Ex. 31. United's burden in articulating legitimate grounds is light. *Opara v. Yellen*, 57 F.4th

709, 725 (9th Cir. 2023) (the burden "is one of production, not persuasion … [and] involve[s] no

credibility assessment"). United's reasons for termination are self-evidently lawful and good faith

reasons. *Dumas v. New United Motor Mfg., Inc.*, 305 Fed. Appx. 445, 448 (9th Cir. 2008) (violation of

company policy is a good faith basis for termination); *Cobb v. Alaska Airlines, Inc.*, 2023 U.S. App.

LEXIS 7066, *1-4 (9th Cir. March 3, 2023) (affirming summary judgment where court held violation

of airline's policy against dishonesty and against use of travel privileges while on medical leave were

legitimate grounds for termination). Plaintiff's use of pass travel while on paid COVID leave was

contrary to the WTG. United's policy is that if an employee is too sick to work, they are presumed too

sick to fly for leisure. Gehrke Decl., Ex. 15; Ex. 3, Prickett Depo. Tr. 48:13-50:17.[11] United had the

legitimate expectation when Plaintiff was taking a paid leave for COVID that she was utilizing time

off for recovery at home. *Id.*, Prickett Depo. Tr. 85:13-86:9. Instead, she used her travel privileges to

fly to Florida to visit a friend. Plaintiff admitted she understood MDP to mean she was being paid due

to COVID sick leave. *Id.*, Ex. 2, PDT 226:2-4. Despite this, Plaintiff represented during the

investigation she traveled because she was no longer experiencing symptoms and to visit a friend. *Id.*,

PDT 248:19-249:1; *see also* Ex. 28. Plaintiff's violation of the policy is a terminable offense and

unrelated to her purported disability and/or age. *Id.*, Ex. 3, Prickett Depo. Tr. 186:14-24; 225:23-

226:13.

---

[11] While Plaintiff may argue she did not need to get permission to use her pass travel while on paid leave for COVID, that misses the mark. Even if permission was not required, United retains the right to investigate employees who use pass travel while on paid sick leave for potential abuse and takes misuse very seriously. United's operating principle is if an employee is out sick that they are at home resting, not travelling for leisure - especially during the height of the 2020 Pandemic.

**C. Plaintiff's Discrimination and Retaliation Claims Fail Because She Cannot Demonstrate United's Legitimate Grounds for Termination Were Pretextual.**

Because United has articulated legitimate bases for Plaintiff's termination, the burden shifts to Plaintiff to prove the stated reasons are pretextual. "Plaintiff must produce 'specific, substantial evidence of pretext.'" *Kaplan v. Baxter Healthcare, Inc.*, 2011 U.S. Dist. LEXIS 164273, *14 (C.D. Cal. Nov. 28, 2011). A "plaintiff may establish pre-text either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *DFEH v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011). Plaintiff cannot satisfy this by stating her subjective view regarding the termination -- rather, Plaintiff must have non-speculative evidence related to the motives of the decision-makers to prove "an actual causal link between prohibited motivation and termination". *Vollmar v. IBM*, 2012 U.S. Dist. LEXIS 122254, *9 (N.D. Cal. Aug. 28, 2012). Plaintiff cannot meet this burden.

*First,* the undisputed facts show that United did not act with discriminatory animus because of any alleged disability (perceived or actual), age, or any other discriminatory or retaliatory motive. Plaintiff was terminated following an investigation into her misconduct in accordance with the JCBA. Plaintiff was represented by her union and was allowed to be heard and present all evidence in her favor. Gehrke Decl., Ex. 2, PDT 295:10-18. Considering all of this, Prickett made a legitimate decision to terminate her employment based on the evidence and statements available to him during the investigation. *Id.*, Ex. 31; Ex. 3, Prickett Depo. Tr. 47:25-48:23; 200:16-207:4. Moreover, Plaintiff admitted that she did not know Prickett prior to the investigatory meeting, undermining any claim that there may be a history of discriminatory motive. *Id.*, Ex. 2, PDT 249:7-24.

Although Plaintiff speculates the DRP made the decision to terminate, there is no evidence they harbored any unlawful animus, that their actions caused the termination, or that Prickett was a "mere instrumentality or conduit" to act out any kind of unlawful animus from the DRP against Plaintiff. *Choochagi v. Barracuda Networks, Inc.*, 60 Cal. App. 5th 444, 461 (2020). Prickett was the one who investigated Plaintiff and she admitted Prickett told her that it was his decision to terminate and he signed the termination letter. *Id.*, Ex. 2, PDT 294:7-24; Ex. 3, Prickett Depo. Tr. 196:9-199:15. Indeed, the undisputed admissible evidence shows that it was Prickett that recommended the decision

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

to terminate to the DRP, not the other way around; moreover, the DRP is an advisory panel and it does not have the ability to overturn the supervisor's decision. Ex. 10, Krabbe Depo. Tr. 44:4-45:7; Ex. 6, ByunRiedel Depo. Tr. 18:20-20:24.[12] Plaintiff indicated White told her the decision was "coming from the top", however, Plaintiff admitted she had no personal knowledge whether anyone else was involved and White admitted her statement was speculation. *Id.*, Ex. 2, PDT 296:3-7; *see also id.*, Ex. 7, White Depo. Tr. 174:3-12; 175:9-14. ***Even if*** it was the DRP as Plaintiff claims, there is no evidence any of them harbored discriminatory animus against Plaintiff or that, if they made the termination decision, that her protected status was a substantial motivating factor. Nor is there evidence Plaintiff was terminated because she needed leave for her COVID or post-viral condition as United granted the leave requests and returned her to work.

*Second*, it is anticipated that Plaintiff will argue that the investigation was deficient because Prickett did not seek clarity what Plaintiff meant when she said she had "no symptoms" and was feeling well enough to travel, and he should have followed up to see if she was distinguishing between post-viral or acute COVID symptoms. It is important to frame the investigation in the time period in which it occurred: only several months into the Pandemic, when much was unknown about the novel virus and prior to widespread knowledge about the residual and longer-term effects of COVID. Prickett testified that post-COVID symptoms were not widely known at the time and he understood that when Plaintiff said she did not have symptoms that she meant she was not experiencing **any symptoms** from COVID. *Id.*, Ex. 3, Prickett Depo. Tr. 221:2-3; 222:23-223:18; 224:8-21. Indeed, Plaintiff testified that it was true she told Prickett that her COVID symptoms lasted until approximately November 17, but what she (now) meant by this was her "contagious" symptoms, but she never told him that distinction. *Id.*, Ex. 2, PDT 247:12-19; 248:19-249:1, 256:22-257:8. Even if Plaintiff was suffering from post-viral symptoms after November 17, Prickett cannot be expected to read Plaintiff's mind -- he reasonably concluded that she violated policy because he determined she was no longer ill

---

[12] To the extent Plaintiff argues Petani's motivations were discriminatory, she was not involved in the termination and after the initial reporting to Prickett had no further communications with him. Gehrke Decl. 5, Petani Depo. Tr. 115:22-116:5, 190:9-24. This is insufficient as a matter of law. *See DeHorney v. Bank of America Nat. Trust and Sav. Ass'n*, 879 F.2d 459, 468 (9th Cir. 1989) (holding that an investigator who reported the conduct of an employee to a supervisor who eventually fired the employee for that conduct is not substantially involved in the employment action without more).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

with COVID after November 17 (because that was what she told him during the investigation) and then used her pass travel while out on a paid leave to recuperate from COVID. The mere fact that the proffered justification was mistaken or false does not demonstrate pretext. *DFEH,* 642 F.3d at 746 (an employee cannot show a decision was wrong, mistaken or unwise, without more, to show pretext); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (it is not important whether the justifications were objectively wrong but only an employer honestly believed them even if "foolish or trivial or even baseless"); *Guthmann v. Classic Residence Mgmt. L.P.*, 2017 U.S. Dist. LEXIS 109845, *43 (N.D. Cal. July 14, 2017) ("an employer's shoddy investigatory efforts is [not] sufficient to establish pretext."); *King v. United Parcel Services, Inc.*, 152 Cal.App.4th 426, 438-439 (2007) (holding there is no requirement an employer's investigation be free of error). What matters in the inquiry is whether the employer honestly believed its stated reasons for termination. *De Paz v. Wells Fargo Bank, N.A.*, 2019 U.S. Dist. LEXIS 230933, *34 (C.D. Cal. Dec. 10, 2019) ("[I]t is not sufficient for a plaintiff 'to simply show that the employer's decision was wrong or mistaken, since the factual dispute…is whether [retaliatory] animus motivated the employer, not whether the employer is wise'").

***Finally***, Plaintiff has not identified any similarly situated employees who committed the same violation but were not terminated. *See De Paz*, 2019 U.S. Dist. LEXIS 230933, *34 (granting summary judgment because "Plaintiff has not marshaled similar evidence that others were treated more leniently for the same conduct, or evidence that the decisionmakers expressed animus"). Specifically, Plaintiff cannot identify any FA who was allowed to travel using pass travel while out on paid sick leave. Gehrke Decl., Ex. 12, Response to No. 18 ("Plaintiff cannot identify by name Flight Attendant(s) who were allowed to travel using UNITED pass travel/leisure travel privileges while out on paid leave of absence/paid sick leave"). Plaintiff cannot identify any similarly situated individuals that she contends were treated more favorably; rather she merely asserts that FAs "were not supposed to be terminated for taking COVID sick leave and the sick leave was not even supposed to count against their sick points or result in points … All employees who were not terminated after taking COVID sick leave and who were pay protected were treated more favorably than Plaintiff." *Id.*, Ex. 12, Response No. 19. However, Plaintiff's framing of comparators is simply incorrect -- those that are similarly situated to her are the FAs in SFO ***who used pass travel while out on COVID leave***, not all FAs who simply took

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

COVID leave. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (holding comparators must be similar in all material respects, including similar jobs, similar conduct, and engaging in "problematic conduct of comparable seriousness."). There is no similarly situated individual who was treated more favorably than Plaintiff. United consistently terminated employees it determined misused pass travel while on paid sick leave. Gehrke Decl., Ex. 34[13] Out of the 492 SFO Inflight employees that contracted COVID, Plaintiff was the only one who was terminated, not because she was absent due to COVID, but on entirely separate policy infractions (*e.g.,* misuse of pass travel). *Id.*, Ex. 10, Krabbe Depo. Tr. 17:21-18:3*; see also* Krabbe Decl., ¶13. Plaintiff has no evidence of pretext and summary judgment is appropriate.

**D. Plaintiff Fails to Establish Harassment under FEHA.**

To establish a claim of harassment/hostile work environment, a plaintiff must demonstrate that: "(1) she is a member of a protected group; (2) she was subjected to harassment because she belongs to this group; and (3) the alleged harassment was so severe that it created a hostile work environment." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013). The plaintiff must show a "concerted pattern of harassment of a repeated, routine or a generalized nature." *Id.* (citing *Aguilar v. Avis Rent A Car Sys., Inc.*, 21 Cal.4th 121, 131 (1999)).

Plaintiff alleges harassment based on age, perceived and actual disability in a single cause of action. To the first element, her disability-related claim fails because she did not have a disability as set forth above. All of her harassment claims separately fail because the purported conduct constituted personnel actions, were not severe or pervasive, and lack the requisite causal link. Her theory for harassment is based on her communications with Petani from November-December 2020, changes to her schedule, and dropping her December 2 pairing when she attempted to return. *See* FAC ¶¶ 83-89.

Plaintiff admits she only had four separate calls with Petani on November 9, 12, 18, and December 1, 2020. *See id.*, Ex. 12 Response to No. 16. Beyond these, Plaintiff did not have any other conversations with Petani. *See* Gehrke Decl., Ex. 2, PDT 215:7-10. These communications included:

---

[13] For example, Prickett terminated a SFO FA for violation of the WTG in May 2021 after determining the FA used pass travel to fly to Puerto Vallarta while on paid leave to get away with his wife and not for the purpose of traveling to warmer weather to heal the FA's knee injury as claimed by the FA. United has consistently terminated FAs where it finds misuse of pass travel while on paid sick or medical leave. Gehrke Decl., Ex. 34, United/Salas_1514-1519.

- **November 9** – Plaintiff testified that Petani asked her how she was feeling, and Plaintiff told her that she was still under quarantine, and about her need to extend her absence until December 1. *Id.*, PDT 169:10-170:25. Plaintiff testified that Petani conveyed that United is taking COVID seriously and terminating people for "claiming COVID falsely." Petani told Plaintiff to ensure that she sent United her medical documentation and Plaintiff responded that her husband was taking care of that with Dr. Jurek. *Id.* Plaintiff admitted that Petani did not directly accuse her of lying about her COVID diagnosis or falsifying the need for COVID leave during that call, but that she "felt that way" and that it was her "interpretation of [Petani] giving me that warning". *Id.*, PDT 171:6-172:11.

- **November 12** – Plaintiff left Petani a voicemail regarding her standby coding. Petani called back to tell Plaintiff to call off sick to protect the operation and that United would fix it later. *Id.,* PDT 197:18-198:16. Plaintiff testified that she did not remember anything else being discussed and that Petani did not imply that Plaintiff was abusing paid sick leave during this call. *Id.*, PDT 198:11-1, 202:2-13. Moreover, the standby coding was removed and fixed.

- **November 18** – Petani called Plaintiff to see how she was feeling. Plaintiff told Petani that she was in quarantine but getting better. *Id.*, PDT 207:4-208:9, 207:14-15. Plaintiff admitted that Petani did not say anything she considered harassing during this call. *Id.,* PDT 207:22-208:1.

- **December 1** – Plaintiff called Petani about the removal of her trip. Petani told Plaintiff to ensure she had submitted her return-to-work paperwork and to call Scheduling. *Id.*, PDT 209:1-210:16. Plaintiff testified that this was the extent of their discussion on December 1. *Id.*, PDT 209:14-16. Nevertheless, Plaintiff testified that she felt it was harassment because she "had a prior discussion [with Petani] about [her] doctor's paperwork, and she knew that I was coming back to work on the 1st. She knew that paperwork was submitted, and therefore her saying 'Make sure you submitted your paperwork' was -- I didn't understand that". *Id.,* PDT 210:21-211:2. However, Plaintiff admitted it was Scheduling that removed the trip and did not have any reason to think Petani instructed Scheduling to do so. *Id.,* PDT 211:4-16. Submission of paperwork in order to return from leave is part of the return to work process. *See id.*, Ex. 20.

While Plaintiff speculates Petani manipulated her schedule by assigning Plaintiff work on November 12 and 13 and/or by removing her trip on December 1, the undisputed facts do not support Plaintiff's speculation. Plaintiff admitted she was not aware of who changed her November schedule. *See id.*, Ex. 2, PDT 227:11-228:20. If Petani modified the schedule, her employee number would appear in the scheduling record and there is no indication of such. *Id.*, Ex. 5, Petani Depo. Tr. 35:15-24; 36:10-24; 38:5-7; *see also* Ex. 7 White Depo. Tr. 224:16-230:14; Ex. 22-23; Krabbe Decl., ¶10. Moreover, Plaintiff speculates Petani mislead Prickett with respect to the investigation, but the undisputed facts do not support these allegations and her claims ultimately fail for the reasons below.

### 1. The Purported Harassing Conduct Constitutes Personnel Management Actions.

The communications with Petani constitute personnel actions. *Gonzales v. City of Martinez*, 638 F. Supp. 2d 1147, 1160 (N.D. Cal. 2009) ("Plaintiff's claims are premised on personnel management decisions which, as a matter of law, cannot support a claim for harassment."). Plaintiff

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

admitted part of Petani's duties was to manage the FAs assigned to her team, including their attendance and sick calls. Gehrke Decl., Ex. 2, PDT 215:11-216:6. Petani was Plaintiff's supervisor. *Id.*, PDT 33:16-23. Plaintiff admitted a supervisor might, as part of their duties, call a FA out on sick leave, particularly an extended leave, to check on them and find out when they might be able to return to work. *Id.*, PDT 217:6-13. The communications were routine and part of the process to understand Plaintiff's leave/return.[14] To the extent she claims United (beyond Petani) harassed her based on the November 13 or December 1 trips, these too are personnel actions as they relate to her work schedule.

As to the investigation, Petani's communications with Prickett and review of Plaintiff's travel history are also personnel actions. Petani and Castelli became aware of Plaintiff's travel because they were concerned that as a commuter, she had flown from her home to the SFO base to work and did not know whether she was still contagious or cleared to return after an inquiry was made by the COVID team. *Id.,* Ex. 9, Castelli Depo. Tr. 38:2-20; Ex. 5, Petani Depo. Tr. 48:15-49:6; 50:8-18; 112:8-15. Plaintiff admitted that, as part of a supervisor's duties, Petani also had the duty to enforce work rules and procedures in the JCBA and WTG. *Id.*, Ex. 2, PDT 217:20-218:1; 219:1-9. Plaintiff's harassment claim is nothing more than her displeasure with her supervisors inquiring into her absence and return to work which is not harassment. *Ramirez v. Little Caesars Enters., Inc.*, 2018 U.S. Dist. LEXIS 189135, *16-17 (C.D. Cal. Nov. 2, 2018), *Roby v. McKesson Corp.*, 47 Cal.4th 686, 707 (2009).

To the extent harassment is based on her termination without conducting an interactive process, this theory fails as she never requested an accommodation beyond leave she needed for COVID, which United provided. Gehrke Decl., Ex. 2, PDT 267:19-286:7; 269:6-13. In any event, denial of an accommodation is a personnel management action and cannot be a basis for harassment. *Duran v. DHL Express (USA), Inc.*, 2016 U.S. Dist. LEXIS 23331, *20 (C.D. Cal. Feb. 24, 2016) (refusal to accommodate "does not qualify as the type of pervasive or severe conduct that would create a hostile work environment"); *Kroeger v. Vertex Aerospace LLC*, 2020 U.S. Dist. LEXIS 117323, *34 (C.D. Cal. June 30, 2020) ("Plaintiff alleges … [they] did not provide him a preferred accommodation … courts have repeatedly held that such actions constitute personnel management acts").

---

[14] Assuming that Petani did modify the schedule, dealing with FA scheduling is within the scope of Petani's role as a FA supervisor and constitutes non-actionable personnel decisions. *Id.*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**2.    The Purported Harassing Conduct Was Not Severe or Pervasive.**

Plaintiff's harassment claim fails because the alleged conduct is not sufficiently severe or pervasive. Plaintiff admits that she had four separate calls from Petani on different dates and no other communications. There were only three isolated scheduling events and the November scheduling assignments were trivial because she did not ultimately work these trips and she was paid for the December trip removal and, shortly thereafter, able to pick up and work another trip starting on December 4. Petani had no involvement in Plaintiff's investigation or termination after it was handed off to Prickett. Gehrke Decl., Ex. 5, Petani Depo. Tr. 115:22-116:5. The purported harassing conduct by its very nature is isolated and sporadic. *See Lyle v. Warner Bros. Television Prods*., 38 Cal.4th 264, 284 (2006) ("when the harassing conduct is not severe in the extreme, more than a few isolated incidents must have occurred to prove a claim based on working conditions."); *Lurie v. Konica Minolta Bus. Sols. U.S.A.,* 2016 U.S. Dist. LEXIS 48511, *7 (C.D. Cal. Apr. 11, 2016) ("occasional, isolated, sporadic, or trivial" misconduct is insufficient to constitute harassment).

**3.    There is No Causal Nexus Between the Conduct and Plaintiff's Protected Status.**

There is no evidence that the purported harassing conduct was in anyway tied to Plaintiff's age or alleged disability. Indeed, there is no causal link between what Petani told Plaintiff and her purported disability or age. As noted above, Plaintiff and Petani only discussed her leave status, return to work, and scheduling issues. There is simply no evidence that Petani made any remarks about her age or disability or that she was targeting Plaintiff due to her age or disability. In addition, there is simply no evidence the scheduling modifications were based on Plaintiff's protected status. Plaintiff was out initially on MDP until her expected return to work in November. MDP does not roll over and the scheduling computer software would assign her a trip on her reserve day unless United obtained a leave extension request to process. *See* Krabbe Decl., ¶¶7-11; Gehrke Decl., Ex. 5, Petani Depo. Tr. 30:10-17, 101:10-102:1; Ex. 3, Prickett Depo. Tr. 180:16-181:8; Ex. 7 White Depo. Tr. 224:16-230:14. United did not obtain her doctor's note to extend her absence until after the November 13 standby trip was assigned on November 12 by the software. *See* Krabbe Decl., ¶10; Gehrke Decl., Ex. 22-23; Ex. 7, White Depo. Tr. 224:16-230:14. The records show that United's Scheduling department did not process the MDP conversion until the following business day on November 13. *See id.*; Gehrke

UNITED'S MOTION FOR SUMMARY JUDGMENT, OR IN ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Decl., Ex. 22-23. Because Plaintiff's paperwork and scheduling changes had not been processed, her schedule showed that she was on Standby and could be assigned a trip. *See* Krabbe Decl., ¶10; Gehrke Decl., Ex. 22-23; White Depo. Tr. 224:16-230:14. There is no evidence anyone at United targeted Plaintiff because of her age or disability, perceived or actual. Once the documentation was processed, United pay-protected and dropped the assignments and her designation was changed back to MDP for the remainder of November. *See* Krabbe Decl., ¶10; Gehrke Decl., Ex. 22-23. She did not ultimately work any trips, so the scheduling change did not meaningfully impact her, nor did she ever complain of harassment or discrimination concerning the scheduling. Gehrke Decl., Ex. 2, PDT 203-204.

After Plaintiff placed herself on sick call on November 12, Plaintiff did not call Scheduling to call off sick leave. *See* Krabbe Decl., ¶11; Gehrke Decl., Ex. 22-23; Ex. 7, White Depo. Tr. 229:19-230:14. Unlike MDP, sick calls roll over so that she would need to call in to remove her sick status, otherwise the scheduling software will automatically remove assignments; because Plaintiff did not call in, she was automatically on a conditional sick status after the initial MDP days, so the trip she tried to pick up on December 1 was automatically removed. *See* Krabbe Decl., ¶¶7-8; 10-11; Gehrke Decl., Ex. 22; Ex. 10, Krabbe Depo. Tr. 73:4-18; Ex. 5, Petani Depo. T. 71:7-14; Ex. 3, Prickett Depo. Tr. 180:16-181:8; Ex. 7, White Depo. Tr. 228:1-22; 265:3-14. However, the issue was fixed and she was able to work on December 4-5, 8, and 11-12. Gehrke Decl., Ex. 2 PDT. 267:14-17; Ex. 7, White Depo. Tr. 229:19-230:14; Krabbe Decl., ¶11. While these scheduling issues might have caused her inconvenience, that is not harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

### E.   There is No Triable Issue of Fact on Plaintiff's Failure to Accommodate Claim.

To state a *prima facie* case for failure to accommodate, a plaintiff must show that: (1) she suffers from a disability covered by the FEHA; and (2) the employer has failed to reasonably accommodate that disability. *Penhall*, U.S. App. LEXIS 4192, *3. As a threshold matter, Plaintiff cannot establish that her COVID symptoms were sufficient to qualify as a disability, as described above. This defect alone is fatal. In addition, to succeed on a failure to accommodate claim "the employee must request an accommodation." *Gelfo v. Lockheed Martin Corp*., 140 Cal.App.4th 34, 54 (2006). The employee bears the burden of notifying the employer of the disability and cooperating with the employer by explaining their disability and its limitations. *Prillman v. United Air Lines, Inc*.,

53 Cal.App.4th 935 (1997). Here, Plaintiff was aware of various departments at United who could and would assist her if she needed an accommodation. *See id*., Ex. 2, PDT 68:12-16, 68:23-69:1-4, 69:6-9, 69:11. The only accommodation she ever sought was a COVID leave, which United provided with pay, without issuing attendance points, and for the entire duration she requested though December 1. *Id.*, PDT 160:22-161:6, 267:19-286:7; 269:6-13. Aside from the approved request for COVID leave, Plaintiff testified that she never requested an accommodation, and United never denied her one. *Id.*, PDT 267:19-286:7; 269:6-13, 271:14-18, 270:8-13.[15] Indeed, Plaintiff admitted that by December 1, she would not need any further accommodations from United. *Id.,* PDT 160:2-5. That is not surprising since Dr. Jurek's note cleared Plaintiff to return to work on December 1 <u>without restrictions</u>. *Id*., Ex. 35. This admission alone is dispositive of her claim. *Gelfo*, 140 Cal.App.4th at 54.

Plaintiff admitted that she never asked United to allow her to travel to Florida as an accommodation. Gehrke, Decl., Ex. 2, PDT 271:14-18. Even if she did, this theory fails because the very nature of this request is neither a "modification or adjustment to the workplace that enables the employee to perform the essential functions of the job held" nor is leisure travel an "essential function" of being a FA. *McCarthy v. R.J. Reynolds Tobacco Co.*, 819 F. Supp. 2d 923, 935 (E.D. Cal. 2011).

### F.  Plaintiff's Failure to Engage in the Interactive Process Claim Fails.

The FEHA prohibits an employer from failing to engage in an interactive process in response to a request for reasonable accommodation by an employee with a known physical or mental disability. *DFEH*, 642 F.3d at 742-743. Plaintiff bears the burden of identifying a specific accommodation that the interactive process should have produced. *See* Gov. Code 12940(n); *Scotch v. Art Institute of California-Orange County, Inc.,* 173 Cal.App.4th 986, 1019 (2009). The "interactive process of fashioning an appropriate accommodation lies primarily with the employee. An employee cannot demand clairvoyance of his employer … Nor is an employer ordinarily liable for failing to accommodate a disability of which it had no knowledge." *King*, 152 Cal.App.4th at 443.

***First***, Plaintiff's interactive process claim fails because she did not have a disability. ***Second***, she did not suggest the need for an accommodation to return to work sooner and thus never triggered

---

[15] Plaintiff admitted that she never raised concerns to United regarding its purported failure to accommodate or engage in the interactive process with her while employed at United. Gehrke Decl., Ex. 2, PDT 77:5-8, 77:10, 77:12-16, 77:21-23.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

United's obligation to engage in the interactive process. Plaintiff cannot point to any evidence that United had a legal obligation to further engage in an interactive process when Plaintiff asked to be off until December 1, her doctor took her off until December 1, and Plaintiff expressed no interest in returning prior. Indeed, Plaintiff admitted that there was nothing United could have done to help her return to work sooner than December 1. Gehrke Decl., Ex. 2, PDT 271:1-13.[16] *Finally*, United provided the only accommodation she requested and the interactive process could have produced (leave for COVID illness). Plaintiff admitted besides requiring time off for COVID, she never asked United for any other accommodation. PDT 267:19-286:7; 269:6-13, 271:14-18, 270:8-13. *Nadaf-Rahrov,* 166 Cal.App.4th at 979-81, 83 ("an employer may be held liable for failing to engage in the good faith interactive process only if a reasonable accommodation was available."). To the extent there was an accommodation she needed, it was not United's failure to engage, but Plaintiff's. *Id.* at 985 (liability attaches "only if the employer is responsible for the breakdown of the interactive process.").

### G. The RLA Preempts Plaintiff's Claims.

The RLA governs labor relations in the airline industry and provides a "comprehensive framework for resolving labor disputes." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248, 252 (1994). This framework includes compulsory arbitration of minor disputes – *i.e.*, those "arising or growing 'out of grievances or…the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 302 (1989).[17] The RLA preempts state law claims that are either "grounded in the provisions of the labor contract or require[] interpretation of it." *Alaska Airlines, Inc. v. Schurke*, 898 F.3d 904, 920 (9th Cir. 2018). "If a claim arises entirely from a right or duty of the CBA … it is, in effect, a CBA dispute in state law garb, and is preempted." *Id.* at 921. If a claim involves a right independent of the CBA, it is still preempted if resolution requires interpretation of the CBA. *Id.* at 922. "A state law claim for wrongful termination by a unionized employee is generally held to be preempted…because the 'right

---

[16] While Plaintiff may argue that United should have accommodated her by allowing her to work her December 2 trip, this is not an accommodation. Rather, that was part of the return-to-work process and United was in discussions with Plaintiff once she inquired as to why the trip was removed. *See id.,* PDT 209:1-210:16. Indeed, United ultimately paid Plaintiff for the removed trip so whatever obligation United had was fulfilled by paying Plaintiff. *Id.*, PDT 265:18-266:4.

[17] For purposes of RLA preemption, courts also rely on case law applying Section 301 of the Labor Management Relations Act. *Espinal v. Nw. Airlines*, 90 F.3d 1452, 1456 (9th Cir. 1996).

UNITED'S MOTION FOR SUMMARY JUDGMENT, OR IN ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

not to be dismissed without just cause is essentially equivalent to a right created by the collective bargaining agreement.'" *Friday v. Hughes Aircraft Co.*, 188 Cal.App.3d 117, 123 (1986).

Here, the RLA preempts Plaintiff's claims. Plaintiff was represented by the AFA. The JCBA governed the terms and conditions of her employment and provided rules as to expectations, rights, and obligations of FAs. There are several disputes here over the interpretation of specific provisions of the JCBA, including those related to United's alleged failure to adhere to the just cause and progressive discipline provisions (Gehrke Decl., Ex. 13); the LOA between United and the AFA regarding COVID sick leave (*Id.*, Ex. 16); and the pass travel guidelines in the WTG which are incorporated into the JCBA (Krabbe Decl. at ¶2). According to Plaintiff "UNITED's stated reason for termination is pretext because traveling while on sick leave does not constitute just cause for termination." FAC ¶¶ 21; ¶ 50. Determining whether the use pass travel benefits while on COVID leave "constitute[s] just cause for termination" requires interpretation of disputed provisions of the CBA, LOA, and WTG that speak directly to the permitted uses of those benefits. *See Carr v. Allied Waste Sys.*, 2010 U.S. Dist. LEXIS 124192, *44-45 (N.D. Cal. Nov. 23, 2010) ("wrongful termination…claim is preempted where the court would be required to 'analyze and interpret the [just cause] provisions of the JCBA to determine whether [the plaintiff]…was wrongfully terminated'"); *Kroeger v. L3 Techs., Inc.*, 2018 U.S. Dist. LEXIS 43006., *9 (C.D. Cal. Mar. 15, 2018) (finding preemption where the court must interpret CBA to determine whether the actions were legitimate factors). Resolution of the parties' dispute is a necessary preliminary step for the Court to evaluate United's reason for termination and Plaintiff's effort to show that United's non-compliance with the JCBA demonstrates pretext. The same is true with respect to Plaintiff's contention that United's failure to apply progressive discipline demonstrates animus or pretext. Absent a clear understanding of what the JCBA and incorporated policies require with respect to the disciplinary steps, the Court could not determine whether United's termination decision reflects a simple application of the JCBA, or an indifference to its requirements. Both conclusions – neither of which the Court can reach without the interpretative legwork – are central to the pretext inquiry and thus to Plaintiff's claims.[18]

---

[18] Plaintiff filed a grievance of her termination precisely based on the dispute on the meaning and import of the JCBA (*e.g.*, just cause, progressive discipline, use of travel pass, etc.). This bolsters United's contention contract interpretation will be central to the resolution of her claims. Although

**H.  There is No Record Evidence to Support Punitive Damages.**

To avoid summary judgment on her punitive damages claim, Plaintiff "must establish by clear and convincing evidence an act of malice, oppression, or fraud" by an officer, director, or managing agent, or ratification of such conduct. *De Paz*, 2019 U.S. Dist. LEXIS 230933, *35. Plaintiff cannot satisfy her burden. Her termination derived from an investigation pursuant to the JCBA and with the involvement of her union. This is not the kind of malicious, oppressive, or fraudulent conduct required to support punitive damages. *Fromson v. Georgia-Pac. Cons. Prods.*, 2014 U.S. Dist. LEXIS 23733, *59 (N.D. Cal. Feb. 24, 2014) (punitive damages require "vile conduct, not just ill-advised or misguided conduct"). Further, those involved in the investigation and/or termination were not officers, directors, or managing agents. *White v. Ultramar, Inc.*, 21 Cal.4th 563, 576 (1999) (managing agents must "exercise substantial authority over decisions that ultimately determine corporate policy."). Prickett was a local supervisor, and although he had authority to terminate, there is no evidence he determined corporate policy. Gehrke Decl., Ex. 3, Prickett Depo. Tr. 132:10-21; *Lomeli v. Hull & Co.*, 2010 U.S. Dist. LEXIS 161356, *22 (C.D. Cal. Nov. 9, 2010) ("supervisor with…direct control' and 'the authority to terminate' employees does not necessarily qualify as a managing agent"). Petani and Castelli were support supervisors, whose responsibilities were to support FAs in their attendance and achievements, and they did not have authority to terminate in 2020; *Id*., Ex. 5, Petani Depo. Tr. 9:20-24; 178:2-9, Ex. 9, Castelli Depo. Tr. 7:2-6. Wright was part of a COVID team, did not have direct reports, and was not a manager. *Id*., Ex. 8, Wright Depo. Tr. 9:2-12:22. ByunRiedel was SFO base director, whose responsibilities were operational performance at the base. Although she had authority to terminate those in her management team, there is no evidence she determined corporate policy. *Id*., Ex. 6, ByunRiedel Depo. Tr. 9:14-17; 13:2-17; 32:2-5. Finally, there is no evidence any officer, director, or managing agent were aware of improper conduct to ratify such conduct. *Taylor v. Trees, Inc.*, 58 F. Supp. 3d 1092, 1107 (E.D. Cal. 2014) ("ratification…requires actual knowledge").

/ / /

/ / /

---

she later withdrew the grievance just prior to a System Board hearing, that does not negate the interpretive task her incorporation of the arguments and issues from her grievance create.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DATED: April 16, 2024

REED SMITH LLP

By: */s/ Michele Haydel Gehrke*
Michele Haydel Gehrke
Brandon Nhan
Attorneys for Defendants
UNITED AIRLINES, INC. and JULIANA
PETANI