Sohaila Sagheb, SBN 144202
sslawoffice@sbcglobal.net
Law Office of Sohaila Sagheb
21112 Ventura Blvd.
Woodland Hills, California  91364
Phone: (818) 346-3724
Fax: (818) 702-9916


Attorneys for Plaintiff Gladys C. Salas

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| GLADYS C. SALAS,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED AIRLINES, INC., a Delaware Corporation, JULIANA PETANI, an individual, SCOTT PRICKETT, an individual, and DOES 1 to 100, inclusive,<br><br>Defendants.<br>_____ | CASE NO. 3:22-cv-04574-RFL<br><br>**PLAINTIFF GLADYS SALAS' OPPOSITION TO DEFENDANT UNITED AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: June 18, 2024<br>Time: 10:00 A.M.<br>Courtroom: 15<br><br>[Filed concurrently with Compendium of Exhibits, Request for Judicial notice, and Declarations of Sohaila Sagheb, Gladys Salas and Damon Raskin, M.D.] |

Plaintiff Gladys C. Salas hereby opposes Defendant United Airlines Inc.'s motion for

summary judgment and partial summary judgment. The motion should be denied in its entirety.

**TABLE OF CONTENTS**

Plaintiff Gladys C. Salas' Opposition to Defendant United Airlines Inc.'s motion for summary judgment and partial summary judgment

MEMORANDUM OF POINTS AND AUTHORITIES ………………………….  2

I.    Introduction ……………………………………………………………..  2

II.   Statement of Facts …………………………………………………………  4

      A.  The Shrinking of Plaintiff's …………………………………………  4
          Approved Leave.

      B.  Dr. Jurek Extends Plaintiff's Leave to ……………………………  4
          12/1/2020 and Petani tells Plaintiff that she
          suspects Plaintiff is Falsely claiming COVID leave.

      C.  Flight Scheduling on 11/12/2020 …………………………………..  5
          and 11/13/2020 and Release from
          Quarantine on 11/18/2020.

      D.  Travel to Florida using Travel Pass ………………………………  6
          11/20/2020 – 11/24/2020

      E.  Plaintiff Truthfully and Accurately …………………………………..  7
          Prepared the Ready to Fly Checklist
          as a United Passenger, not a United
          Employee

      F.  Attempted Return to Work on 12/1/2020 …………………………  7
          was the trip that was taken away

      G.  Return to Work Documentation and ………………………………  8
          LOI instigated by Petani

      H. First Investigatory Meeting. …………………………………………  10

      I. Prickett Consults with the DRP………………………………………  11
         after the First Investigatory Meeting.

      J. Second Investigatory Meeting 1/12/2021 – …………………………  13
         Prickett Apologizes to Plaintiff for
         Terminating Plaintiff and Tells Her
         that she Should Appeal the Decision.

      K. COVID-19 Related Terminations. …………………………………  13

i
--

III.  Argument……………………………………………………………  13

    A.  There are Triable Issues of Material…………………………..  13
        fact as to Plaintiff's Discrimination
        Claim.

        1.  Plaintiff's COVID constituted …………………………….  13
           a Disability under FEHA

        2.  *IF* the Pass Travel Benefit is Limited ……………………..  16
           to Healthy Employees as Suggested by
           the Motion, it is Discriminatory on its Face –
           Direct Evidence of Disparate Treatment.

        3.  "But For" or "Because of" Does not require……………………  18
           Showing a Discriminatory Motive in
           Disability Discrimination

        4.  There are Triable Issues of Material Fact re ………………………  20
           Plaintiff's "Regarded as" Claim

        5.  There are Triable Issues of Material fact …………………………  21
           as to Plaintiff's Discrimination
           Claim based on Age

    B.  There are Triable Issues of Material fact …………………………  22
        as to Plaintiff's Retaliation Claim

    C.  United's Purported Legitimate Ground for ……………………….  23
        Termination were Pretextual

    D.  If the Court determines United has presented …………………………  24
        a Legitimate Ground for Termination Plaintiff
        can show the reasons to be Pretextual

    E.  There are Triable Issues of Material Fact as to …………………………  26
        Plaintiff's Harassment Claim

        1. Petani's Conduct cannot be explained as ……………………………  26
          Personnel Management Actions.

        2. Petani's Harassment resulted in the …………………………………  27
          Termination of Plaintiff's 28-year old
          Employment.

3. The Only Nexus between Petani's ……………………………… 28
   Harassment and Plaintiff is the fact
   that Plaintiff needed Extended COVID
   Leave due her Age and Disability.

F.   Plaintiff's Failure to Engage in the ……………………………… 28
     Interactive Process and Failure to
     Accommodate Claims are Supported by
     Factual Allegations

G.   Plaintiff's Action is based on FEHA Violations, ……………………… 29
     not on breach of the JCBA and is not Preempted

H.   Punitive Damages…………………………………………………… 31

**TABLE OF AUTHORITIES**
Plaintiff Gladys C. Salas' Opposition to Defendant United Airlines Inc.'s motion for
summary judgment and partial summary judgment

**Judicial Authorities**

*Alaska Airlines v. Schurke* ……………………………………… 29-30
(9th Cir. 2018) 898 F.3d 904, 920-921

*Allis–Chalmers Corp. v. Lueck* ……………………………………… 30
(1985) 471 U.S. 202, 220,
105 S.Ct. 1904, 1915–1916

*Areopaja v. Morrison Mgmt. Specialists,* ………………………… 14
CV 21-4739-RSWL-JPRx, at *11
(C.D. Cal. Mar. 14, 2023)

*Arteaga v. Brink's, Inc.* ……………………………………… 20
(2008) 163 Cal.App.4th 327, 345.

*Auto. Workers v. Johnson Controls, Inc.,* ………………………… 16
499 U.S. 187, 190 (1991)

*Begnal v. Canfield Associates Inc.* ……………………………… 22
(2000) 78 Cal.App.4th 66, 74-76.

*Brown v. Roanoke Rehab. & Healthcare Ctr.,* ………………………… 15
586 F. Supp. 3d 1171, 1175-76 (M.D. Ala. 2022).

*California FEH v. Gemini Aluminum* ………………………………… 28
(2004) 122 Cal. App 4th 1004, 1015

*Cloud v. Casey* ……………………………………… 31
(1999) 76 Cal. App. 4th 895

*Cobb v. Alaska Airlines, Inc.,* ……………………..………………… 24
No. 22-35240, at *4 (9th Cir. Mar. 23, 2023)

*Davis v. Team Elec. Co.* ………………………………..…………… 27
 (9th Cir. 2008) 520 Fed.3rd 1080, 1096

*Dee v. Vintage Petroleum, Inc.* ………………………………… 27
(2003) 106 Cal.App.4th 30, 35

*Diaz v. Fed. Express Corp.,* ……………………………………… 13
373 F. Supp. 2d 1034, 1052 (C.D. Cal. 2005)

*Fry v. Airline Pilots Ass'n, Int'l,* …………………………………….. 31
88 F.3d 831 (10th Cir. 1996)

*Gelfo v. Lockheed Martin Corp.* ……………………………………… 29
(2006) 140 Cal.App.4th 34, 54.

*Guz v. Bechtel Nat. Inc.,* ……………………………………………… 24
(2000) 24 Cal. 4th 317

*Hafford v. Seidner* …………………………………………… 27
(6th Cri. 1999) 183 Fed.3rd 506, 515

*Harris v. Forkleft Systems, Inc.,* ……………………………………… 27
(1993) 510 US 17, 23

*Harvill v. Westward Communications, L.L.C.* ……………………………… 27
(5th Cir. 2005) 433 Fed.3rd 428, 435

*Hawaiian Airlines, Inc. v. Norris* ………………………………….. 30
(1994) 512 US 246, 266.

*Hernandez v. Valley View Hosp. Ass'n* ……………………………………… 28
(10th Cir. 2012) 684 F3d 950, 958

*Hicks v.  Gates Rubber Co.* ……………………………………… 27
(10th Cir. 1987) 833 Fed.2nd 1406, 1416.

*Hishon v. King & Spalding,* ……………………………………… 17
467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)

*Hoffman v. Caterpillar, Inc.,* ……………………………………… 16
256 F.3d 568, 572 (7th Cir. 2001)

*Husman v. Toyota Motor Credit Corp.* ……………………………………… 20
(2017) 12 Cal. App. 5th 1168, 1184–85.

*Johnson Controls, Inc. v. Fair Employment Housing Comm'n* ……………… 16
(1990) 218 Cal.App.3d 517

*Juell v. Forest  pharm* ……………………………………….. 26
(ED CA 2006) 456 F.Supp.2d 1141, 1157.

*Lawler v. Montblanc* ……………………………………………… 26
(9th Cir. 2013) 704 Fed.3rd 1235, 1244-1245.

v
--

*Lorillard v. Pons,* …………………………………………………… 17
(1978) 434 U.S. 575, 98 S. Ct. 866

*McDonnell Douglas Corp. v. Green* ………………………………… 18
(1973) 411 U.S. 792, 93 S.Ct. 1817

*McKinney v. Office of Sheriff of Whitley County* ……………………… 24
(7th Cir 2017) 866 Fed.3rd 803, 810

*Merrick v. Hilton Worldwide,* ……………………………………… 21
867 F.3d 1139, 1146 (9th Cir. 2017).

*Miles v. M.N.C. Corp.* ……………………………………………… 18
(11th Cir.1985) 750 F.2d 867, 869

*Miller v. Dep't of Corr.* …………………………………………… 26
(2005) 36 Cal. 4th 446.

*Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen.,* ……………… 15
50 F.4th 1126, 1156 (11th Cir. 2022),

*O'Regan v. Arbitration Forums, Inc.* ………………………………….. 24
(7th Cir. 2001) 246 Fed.3rd 975, 983.

*Price Waterhouse v. Hopkins* ……………………………………… 18
(1989) 490 U.S. 228, 244–245, 109 S.Ct. 1775

*Prilliman v. United Air Lines, Inc.* ………………………….………….. 28
(1997) 53 Cal. App. 4th 935, 949-950.

*Reeves v. C.H. Robinson Worldwide, Inc.* ……………………….…….. 27
 (11th Cir. 2010) 594 Fed.3rd 798, 811-812

*Reeves v. Sanderson Plumbing Prod., Inc.,* ………………………….…… 24
530 U.S. 133, 120 S. Ct. 2097 (2000)

*Roby v. McKesson Corp.* ……………………………………….…… 27
(2009) 47 Cal. 4th 686, 707–08,
as modified (Feb. 10, 2010)

*Roman v. Hertz Local Edition Corp.,* …………………………………… 14
S.D. California, No. 20-cv-2462-BEN (AGS)
(May 16, 2022)*,*

*Saridakis v. United Airlines* …………………………………………… 31
(9th Cir. 1999) 166 F3d 1272, 1278

*Scotch v. Art Institute* ........................................................ 28
(2009) 173 Cal.App.4th 986, 1018–1019

*Sieberns v. Wal–Mart Stores, Inc*., ..................................... 16
125 F.3d 1019, 1021–22 (7th Cir.1997)

*Soldinger v. Nw. Airlines, Inc.,* ........................................... 30
(1996) 51 Cal. App. 4th 345

*Trans World Airlines, Inc. v. Thurston,* ................................ 17
(1985) 469 U.S. 111, 120–21, 105 S. Ct. 613, 621,

*Tripton v. Airport Terminal Servs., Inc.* ............................... 22
No. CV1809503ABJEMX, 2019 WL 4231234,
AT *9 (C.D. Cal. June 25, 2019)

*Wallace v. Cnty. of Stanislaus* ............................................ 13
(2016) 245 Cal. App. 4th 109, 134.

*Ward v. United Airlines, Inc.,* ............................................. 30
986 F.3d 1234, 1244 (9th Cir. 2021).

*West v. Scott Lab'ys, Inc.,* .................................................. 14
No. 23-15502, 2023 WL 6172009
(9th Cir. Sept. 22, 2023)

*Yanowitz v. L'Oreal USA, Inc.* ............................................ 22
(2005) 36 CA.4th 1028, 1042.

**Statutes**

Cal. Code Regs., tit. 2, § 11069, subd. (a) ............................ 29

Gov't Code, § 12940, subd. (n) ........................................... 29

Gov't Code, § 12940, subd. (m)(1) ...................................... 28

Gov. C § 12926(m)(1)(B)(iii) .............................................. 14

Gov't Code §12940(m)(2) .................................................. 22

Gov. Code §12940(j) ......................................................... 26

**Secondary Authorities**

Government Code §12926.1 ................................................ 13

*What You Should Know About COVID-19 and the* ………………………… 14
*ADA, the Rehabilitation Act, and Other EEO Laws*,
U.S. Equal Employment Opportunity Commission,
https://www.eeoc.gov/wysk/what-you-should-know-
about-COVID-19-and-ada-rehabilitation-act-and-other-
eeo-laws/ (last updated July 12, 2022).

Chin, *Practice Guide,* §9:2266 …………………………………………… 29

California Practice Guide, *Employment Litigation*, 7:368. …………………… 19

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      Introduction

Flight Attendants (FA) at United Airlines, Inc. ("United") "have always been able to travel while on sick leave." (Ex. Q[1], White Depo, 84:11-12.) Whether Plaintiff went to Orlando as part of her recuperation is completely irrelevant to the issue of whether Plaintiff misused Pass Travel. Plaintiff was told by her physician not to return to work until 12/1/2020 because it would have been dangerous for her to do so.

In the interest of brevity, Plaintiff summarizes this opposition as follows: Plaintiff's COVID constituted a Disability under FEHA. *IF* United's Pass Travel benefit is limited to healthy employees as suggested by this Motion it is discriminatory on its Face – Direct Evidence of Disparate Treatment. If not, Plaintiff has sufficient evidence to meet her burden under the *McDonnell Douglas* test.

United's had no legitimate ground to terminate Plaintiff and those asserted herein are pretextual. Scott Prickett's (Prickett) comments at the termination meeting reflect that Plaintiff was a "great" employee. Neither taking sick leave nor travelling to Florida constituted a performance issue as now argued by United. Punitive damages are warranted as Plaintiff's termination was ratified by United's corporate manager, Elizabeth Cavanagh (and others).

Finally, as this court has already held on United's Motion to Dismiss, Plaintiff's action is based on FEHA Violations, not on breach of the JCBA; it is not RLA Preempted. Dkt. 36

## II.      Statement of Facts

Plaintiff Salas worked for United and its predecessors as a FA since 1993. (Salas Dec., ¶2.) She was an excellent employee with no infractions. (*Id*.) United fired Plaintiff after she required extended COVID leave.

In 2020 Plaintiff was based out of United's San Francisco base (SFO). This meant that even though she lived in Ohio she would have to commute to SFO where each one of Plaintiff's trip pairings began and ended. Plaintiff could pick up flights out of base (such as in Cleveland, her local airport) but not until 12-14 hours before the flight. (Salas Dec., ¶4.)

One of the benefits of being a United FA is the Travel Pass which permits FAs and their families to fly for free. (Ex. CC.)

---

1  All Exhibits submitted in support of this opposition are attached to Compendium of Exhibits submitted herewith and referenced is this opposition by Exhibit Letter(s).

From 10/15/2020 – 10/20/2020 Plaintiff and her husband used Plaintiff's Travel Pass to vacation in Los Angeles. (Ex. O, Salas Depo, 86:1-5.) On 10/20/2020 Plaintiff's husband flew from SFO to Cleveland by himself. (*Id.,* 86:17-19.) Plaintiff stayed to connect for a work trip. (*Id.,* 86:20-22.)  From 10/20/2020 – 10/24/2020 plaintiff flew domestic routes and one trip to Mexico. On 10/25/2020 Plaintiff commuted home to Cleveland through Chicago. (*Id.,* 88:2 – 89:19.) Late night 10/25/2020 or early morning 10/26/2020 Plaintiff felt ill. When it was daylight Plaintiff went to CVS for a COVID-19 test. (*Id.,* 122:2-4; 127:8-9; 129:3-9.) At no time before October 26, 2020 did Plaintiff suspect that she might have COVID or symptoms. (*Id.,* 96:6-11.)

Plaintiff was not advised of her positive COVID-19 test until 10/29/2020.  (*Id.,* 127:10-12; Ex. EE.) Plaintiff contacted United that morning and spoke with Joanna Wright who was part of United's COVID Response team. (Ex. O, Salas Depo, 119:13 – 25; 120:13-21.) During the call Plaintiff reported in retrospect fatigue, headache and a single incident of diarrhea but stated that she did not know whether these symptoms were illness related. (*Id.,* 121:8-16; 122:10-16.)[2]

After 10/26/2020 Plaintiff's COVID symptoms included extreme fatigue[3], headache, being bedridden, unable to eat, loss of taste and smell, cough[4], increasing fatigue, fever[5], chills[6], sweats, rash[7] and the inability to bathe herself. (*Id.,* 96:22-23; 97:15-22.) Plaintiff was unable to walk without assistance for the first five days of illness. (*Id.,* 98:9-12.) Nor was Plaintiff able to speak properly. She slurred and did not make any sense. (*Id.,* 98:18-23.)

Plaintiff's husband Sam Salas described Plaintiff's illness in October 2020 as bedridden and shaking, he had to feed her, take her to the bathroom, give her a bath. (Ex. P, S. Salas Depo, 83:2-85:7.) Mr. Salas described Plaintiff's inability to answer questions and lapses of memory such as leaving the stove on. (*Id.,* 89:3-10.) Plaintiff reported she couldn't think. (*Id.,*89:25-90:1.)

Plaintiff started to improve after five days of severe illness but that does not mean that her symptoms only lasted five days.  (Ex. O, Salas Depo, 99:3-8) On 11/9/2020 Plaintiff complained of cough, fatigue, dizziness and brain fog. (*Id.,* 151:10-14.) Plaintiff's long COVID recovery extended into December/January 2021.  (*Id.,* 99:9-12.)

---

2 When speaking with Lorain County Plaintiff reported the same information.  (*Id.,* 117:16 – 21)
3 Plaintiff reported extreme weakness, body aches and sweating 10/31/2020. (*Id.,* 143:22-24)
4 Plaintiff reported cough on 11/9/2020. (*Id.,* 151:2-5.)
5 Plaintiff reported a fever of 101.8 from 10/27/2020 – 10/30/2020. (*Id.,* 143:11-15.)
6 Plaintiff reported chills from 10/25/2020 – 10/230/2020. (*Id.,* 143:19-21.)
7 Plaintiff reported rash to the county 10/28/2020. (*Id.,* 143:16-18.)

Plaintiff's husband Sam Salas became symptomatic around 10/28-29/2020. (*Id.,* 126:5-8; 127:16-128:1; 146:7-10)  Plaintiff notified United. (*Id.,* 130:1-7.)

On 10/29/2020 Joanna sent Plaintiff an email stating Joanna had contacted the FAST[8] Team to "show you out on MDP for your reserve days November 1 – 12." (*Id.,* 131:17-21; Ex. FF.) Joanne also told Plaintiff that she would "notify base" and instructed Plaintiff to send her test results to OPCMD (United's medical dept). Plaintiff complied. (*Id.,* 135:13-16.)

Plaintiff self-isolated consistent with her county's instructions starting on 10/26/2020. (*Id.,* 137:24-138:25.)

**A.  The Shrinking of Plaintiff's Approved Leave.**

In order to change MPD it must be manually entered. Unlike regular sick leave, MPD does not roll. (Krabbe Dec.) Despite confirming dates off to 11/12/2020, Joanna's email to the FAST Team only requested that Plaintiff be shown MDP from 11/1 – 11/11. (Ex. HH.) The FAST team acknowledged "MDP was approved for the following dates: 11/1 – 11/11". (*Id.*)

Joanna also contacted SFO supervisor John Wolfe telling him that Plaintiff had tested positive for COVID-19 and that once Plaintiff was ready to return to work an email should be sent to inflightcovid19@United.com. (Ex. JJ) Petani, who had been tasked by United to keep track of all SFO COVID-19 sick calls, responded to Joana stating they would follow up with Plaintiff. (Ex. KK; Petani Depo, 83:16-24.) Even though Petani was Plaintiff's supervisor at SFO, Plaintiff had never spoken with or met Petani prior to dealing with her on the COVID issue.[9] In the regular sick leave scenario, a FA would never contact their supervisor.

Unexpectedly, on 11/6/2020 Plaintiff received a call and email from United telling her that she was expected back to work on 11/9/2020. (Ex. LL.) This made no sense to Plaintiff who expected to be out until 11/12/2020. Moreover it makes no sense in the context of the Krabby declaration that MDP can only be modified manually. Some United employee had to manually change Plaintiff's return date from 11/12/2020 or 11/11/2020 to 11/9/2020. No explanation is provided by the MSJ regarding authorization to limit Plaintiff's leave to 11/9/2020.

**B. Dr. Jurek Extends Plaintiff's Leave to 12/1/2020 and Petani tells Plaintiff that she suspects Plaintiff is Falsely claiming COVID leave.**

---

8  FAST stands for Flight Attendant Support Team. Ex. N Prickett Depo, 124:4-5
9  At United, it is common for FAs to never contact or even know who their supervisor is. (Ex. Q, White Depo, 35:10-14.)

There is a significant safety component to being a FA and FAs are required to do annual safety training. (Ex. J, Castelli Depo, 61:4-7.) "If a flight attendant is impaired at work, they're going to be terminated." (*Id.,* 62:3-4.)

Dr. Jurek has been Plaintiff's Primary Care Physician since the 1990s. (Ex. O, Salas Depo, 102:24-103:5.) 11/6/2020 was a Friday and Plaintiff was still quite ill. (Salas Dec., ¶17.) Nonetheless, Plaintiff frantically called Dr. Jurek's office and obtained a telemedicine appointment for Monday 11/9/2020. (Ex. O, Salas Depo, 163:24-164:1.) Plaintiff was still sick, in bed and under quarantine. (*Id.,* 164:2-6) Plaintiff told Dr. Jurek that she continued to have cough, confusion in thinking, fatigue, pain in her back and underneath her ribs. (*Id.,* 164:20-25.) Dr. Jurek assessed Plaintiff as suffering from post-viral syndrome and placed her off work until 12/1/20220. (Ex. NN.) Dr. Jurek assured Plaintiff that she was no longer contagious and that the additional time to 12/1/2020 would permit her brain fog to clear and permit her to become stronger. (*Id.,* 158:19-159:2.)

Dr. Jurek's note was faxed to United medical on 11/12/2020. (Ex. II.) As such, as of 11/12/2020, Plaintiff's MDP sick leave should have been extended to 12/1/2020 per the LA. Indeed, the extension was acknowledged via an email from United Help Hub to Plaintiff on 11/12/2020. (Ex. OO.)

Even though the fax from Dr. Jurek's office was not sent until 11/12/2020, United knew that Plaintiff's leave had been extended by her doctor to 12/1/2020 because on 11/9/2020 Plaintiff called Petani and told her that Dr. Jurek had extended Plaintiff's sick leave. (Ex. O, Salas Depo, 169:10-18.) In response Petani accused Plaintiff of falsely claiming sick leave, telling her that United was terminating FAs for claiming COVID falsely. (*Id.,* 170:10-16.) Plaintiff believed she was being accused of lying and that staying on COVID leave jeopardized her job. (*Id.,* 171:9-12[10]) Petani was not just insinuating that Plaintiff was falsely extending her COVID leave but explicitly warning Plaintiff of her of Petani's suspicion. (*Id.,* 171:13-172:7.)

### C. Flight Scheduling on 11/12/2020 and 11/13/2020 and Release from Quarantine on 11/18/2020.

On 11/12/2020 United's scheduling department scheduled Plaintiff for standby flight to China. Plaintiff's Master Schedule shows the 12th was an off day for her. (Ex.UU.)

---

[10] Prickett testified that he did non-COVID related wellness checks but never had occasion to tell an employee that unless they returned to work they were jeopardizing their job. Ex. N, Prickett Depo, 173:24-174:9. The routine was generally to inquire whether the sick employee needed support. *Id.,* 173:6-12.

When Plaintiff saw that her scheduled reflected her on standby for 11/12/2020 she called scheduling and told them that she would not be returning to work until 12/1/2020 and that she had submitted the paperwork. When Plaintiff reported the scheduled on the 12th to Petani, Petani's instructed Plaintiff to put her on sick leave, the kind that rolls. Petani told Plaintiff that they would later "fix it" later. (Ex. O, Salas Depo, 186:23-187:3; 188:1-8; 196:2-13.) Petani took no steps to "fix it" at any time and Plaintiff was already MDP on the 12th. Nonetheless, Plaintiff did as she was instructed by Petani.

Plaintiff also spoke with Joanna on 11/12/2023 to report that despite extending her sick leave she had been scheduled on a flight to China on 11/13/2020. (Ex. O, Salas Depo, 184:15-23.) Joanna told Plaintiff "We are releasing you per your doctor's note until December 1st." (*Id.*, 194:13-17.) Joanna also emailed United's FAST Team to convert Plaintiff's pairing to MDP. (Ex. PP[11]) United's FAST Team responded that MDP had already (was) been approved for 11/12/2020-12/1/2020. (Ex. RR.)

After Plaintiff was presumably MDP *and* had placed herself on sick leave, on 11/13/2020 Plaintiff received a call from United scheduling seeking to schedule her on a flight to China. (Ex. O, Salas Depo, 186:12-17.) Plaintiff advised United that she was sick. (*Id.*, 192:3-11.)

Krabbe's declaration does not explain why, if sick leave rolls and Plaintiff placed herself on sick leave on the 12th she would be assigned a flight on the 13th. Nor is there any explanation for how the manually entered MDP on the 12th resulted in flight scheduling on the 13th.

Petani called Plaintiff again on 11/18/2020 before Plaintiff had been released from quarantine by the county. Plaintiff stated that she was getting better but that she still in quarantine. (Ex. O, Salas Depo 207:1-20.) Plaintiff was released from quarantine on 11/18/2020. (Ex. 33.)

**D. Travel to Florida using Travel Pass 11/20/2020 – 11/24/2020**

Two preliminary matters: First, United's assertion the Pass Travel policy, as part of the Working Together Guidelines (WTG), is part of the JCBA is simply not true. The primary reason is that United reserves the right to modify or terminate Pass Travel – not true of terms collectively bargained. Unlike the JCBA, the WTG "are super vague and can be changed at any time. And there's no notice when they do change." (Ex. Q, White Depo, 53:16-53:3.) Prickett testified that the WTG are not rules or policies but just "guidelines". (Ex. N, Prickett Depo, 55:6-56:9.)

---

11   There is an error in Joanna's email of Nov. 12th wherein she states that Plaintiff's "Dr has extended her quarantine until 1DEC." In fact, Plaintiff's quarantine was imposed by her county, not her doctor. Dr. Jurek advised Plaintiff during the Nov. 9 visit that she was no longer contagious.

Second: The cost of a plane trip from Cleveland to Florida in November 2020 was between $40-$50. (Ex. UUU .) In using her Pass Travel to make the trip to Florida, Plaintiff was not hiding anything from United. The rule was that she could travel while on sick leave.

After being released from quarantine Plaintiff booked a trip to travel with a friend, another FA at United, from Cleveland to Orlando and back on 11/20/2020 and 11/24/2020. (Ex. O, Salas Depo, 230:22-232:13; 233:18-24; 235:4-7) The trip was to see a friend and tied to Plaintiff's recovery. (*Id.,* 235:19-25; Raskin Dec.) While in Florida Plaintiff and her girlfriends walked in the neighborhood, went to the grocery store and went to the beach. Combating fatigue and continued brain fog and after almost a month of quarantine. The trip positively affected Plaintiff's energy and elevated her mood which had become depressed as a result of illness and quarantine. (*Id.*, 238:8-14; 241:16-424:10.)

### E. Plaintiff Truthfully and Accurately Prepared the Ready to Fly Checklist as a United Passenger, not a United Employee

Plaintiff truthfully answered the questions on the checklist indicating that (1) she had not been diagnosed in the last 21 days (2) the self-assessment requirement of the check list did not apply to Plaintiff who had been told on 11/9/2020 she was no longer contagious and had been released from quarantine on November 18, 2020; and (3) she had not had contact in the 14 days prior with anyone who had COVID. (Ex. HHH; Raskin Dec. & report.)

### F. Attempted Return to Work on 12/1/2020 - trip that was taken away

Plaintiff's return to work trip was scheduled for 12/1/2020, for a trip picked up out of Cleveland, avoiding a commute to SFO. (Salas Dec., ¶39.) On the way to the airport Plaintiff learned that her trip had been taken from her. "Any management employee in-flight [at United] would be able to alter a flight attendant's schedule." (Ex. N, Prickett Depo, 169:12-15; 169:24-170:1.) No management employee other than Petani had reason to pull Plaintiff's 12/1/2020 trip.

Plaintiff called Petani complaining that her 12/1/2020 trip had been removed from her schedule. (Ex. O, Salas Depo, 209:1-210:3) Knowing Plaintiff had submitted her returned her return to work paperwork the only assistance Petani offered was that Plaintiff should submit return to work paperwork. (*Id.*) Otherwise Petani did not offer to or assist.

Krabbe tries to explain that Plaintiff's 12/1/2020 pairing was removed from her because she had not called in well. But Plaintiff called in sick on 11/12/2020 and was scheduled for another flight on 11/13/2020. In addition, the "sick call" was "fixed" and converted to MDP – in

reality it didn't need to be "fixed" because it was coded MDP on the 12th. (Ex. RR.) Also, if Plaintiff had not called in well by 12/1/2020 she certainly had not done so by 11/13/2020 when United tried to schedule her to fly to China. As such there are material triable issues as to conclusions in Krabbe's declaration related to the removal of Plaintiff's trip on 12/1/2020. In addition, as set forth in Plaintiff's declaration, her call on 12/4/2020 was not to United scheduling to "call in well" but to pick up out of base. (Salas Dec., ¶41.)

After 12/1/2020 Plaintiff picked up trips out of Cleveland and worked trips on December 4-5, 8, 11-12. (Ex. O, Salas Depo, 214:12-14.)

**G. Return to Work Documentation and LOI instigated by Petani**

As a preliminary matter it is important to note the following distinction:

Supervisors like Petani has access to and can change the schedules of FAs. (Ex. N, Prickett Depo, 169:12-15; 169:24-170:1.)

However, Supervisors like Petani do not have access to a FA's Pass Travel. In order to obtain a FA's Pass Travel a Supervisor must submit a request to United's Help Hub. (Ex. J, Castelli Depo, 39:18-22.) Castelli testified that he had reviewed his electronic footprint with United's Help Hub and knew he did not pull Plaintiff's travel. (*Id.,*, 38:2-3; 40:7-21.) That left only Petani. *When* Petani pulled Plaintiff's Pass Travel is unknown and unexplained by this motion. Petani's proffered explanation for *why* she pulled Plaintiff's Pass Travel is a lie, as explained below.

Anyone in United's management, including Petani, can investigate non-management employees. (Ex. L, Krabbe Depo, 48:18-49:4, 449:14-25.) Petani testified that she was qualified to conduct investigations and had participated in investigations since 2018. (Ex. M, Petani Depo, 173:2-174:9.) To distance herself, Petani asked Prickett to investigate Plaintiff. (Ex. N, Prickett Depo, 130:2-131:4.)

Prickett did not know why Petani would have had access to Plaintiff's Pass Travel and does not recall whether he asked Petani how she came by Plaintiff's Pass Travel data. (*Id.,* 13:12-1138:1; 138:21-139:3.)

The impetus for the investigation of Plaintiff was the dishonest email statements of Petani. (Ex. Q, White Depo, 75:14-18.)  On 12/10/2020 at 10:10 am United's Mark Jacobs reached out for Plaintiff's return to work documentation including Petani on his email inquiry. (Ex. VV.) On the same date at 10:39 am Jill Demma at United medical responded letting Mr.

Jacobs know that Plaintiff had returned her return to work paperwork and at 12:24 pm clarified that Plaintiff was not required to retest. (*Id.*) Within three and a half hours Mr. Jacobs' inquiry was fully answered. (Ex. J, Castelli Depo, 96:23-97:7.)

**After the issue raised by Mr. Jacobs was resolved**, Petani seized this opportunity to spread lies about Plaintiff. On 12/10/2020 at 12:28 pm Petani wrote to Mr. Jacobs that her last communication with Gladys was 12/1 – "I informed Gladys the UA requirements for RTW. **Also, she called me to ask for permission to fly and I advised her not to.** On my last telephone conversation with her, Gladys advised me that her clearance docs were set to opcmd." (Ex. WW.) At deposition, Petani admitted that Plaintiff never asked her for permission to travel to Florida in November 2020. (Ex.M, Petani Depo, 195:18-25.)

Based on Petani's statement that she advised Plaintiff not to fly Prickett was prompted to ask whether Petani advised Plaintiff not to travel prior to 11/20/2020. (Ex. XX; Ex. N, Prickett Depo, 181:11-20.) Petani's response was "Yes, that's correct" further misleading Prickett. (Ex. YY.)

Petani's statement regarding Plaintiff's alleged "permission to fly" is a lie relied upon by Prickett to commence his investigation. (Ex. N, Prickett Depo, 176:1-4.) FAs do not require permission to fly (Ex. Q,White, 77:24-25) and Salas never called Petani for permission to fly. (Salas Dec., ¶44-45.)  Note that when Plaintiff received her positive COVID test she did not call Petani. The universe of communications between Plaintiff and Petain are four calls:

1st – 11/9/2020 (Salas Depo, 221:1-3); 2nd – 11/12/2020 (*Id.,* 221:7-10); 3rd – 11/18/ 2020 (*Id.,* 222:15-21) and 4th – 12/1/2020 (*Id.,* 223:4-11). [12]

At deposition Petani lied again, this time under oath, testifying that Plaintiff told Petani that she was ill while in Houston with her husband on 10/20/2020 and that was when Petani told Plaintiff not to fly. (Ex. M, Petani Depo, 92:15-94:2) Not only was Plaintiff not with her husband on 10/20/2020 or in Texas, but even with the benefit of the doubt that Petani got some of the dates and circumstances wrong in deposition, Petani's statements are unbelievable because the rest of Petani's 12/10/2020 email confirms that **the first time** Plaintiff communicated with Petani was on 11/09/2020 to extend her COVID absence. On 11/12/2020, according to Petani's log, (1) Petani asked Plaintiff "to place herself onsl [on sick leave] to protect ops"; (2) Plaintiff was "off

---

12 According to United Petani and Plaintiff communicated three times: "on or around November 9, 2020; on or around November 12, 2020; and on or around December 1, 2020." (Ex. TTT, #12.)

for the rest of the month"; and (3) "Her doctor has cleared FA effective 12/01 – docs sent to UA Medical per FA." (Ex. YY.)

Petani responded to Prickett's 12/21/2020 at 2:51 pm email on 12/21/2020 at 6:14 pm "Yes, that's correct – she flew prior to being cleared to return to work, knowing she had Covid - she told me she was planning to fly and I told her not to." (Ex. YY.) Petani knew this wasn't true because Plaintiff told her on 11/9/2020 that her return to work paperwork had been submitted.[13] Prickett asked "Do you know the specific date though?" Petani responded "No I do not. She was originally in Houston. When she was there, I told her not to fly. She did proceed with her travels to California and went to other destinations, yet still onsl [on sick leave]. Nonetheless, she should not be flying while onl [on leave]." (Ex. ZZ.) This email scrambles all the others. First Petani is talking about Houston which was in October after Plaintiff's vacation with her husband and before Plaintiff got sick (all information Petani must have obtained from Plaintiff's Pass Travel). Then Patani is talking about Plaintiff's trip to California, also before Plaintiff got sick but adding that she was already on sick leave. Petani's gyrations should have triggered Prickett to ask further questions. Instead, he plodded on with United corporate and specifically Elizabeth Cavanagh and the Discipline Review Committee (DRE) were calling the shots.

At deposition, Petani testified that she pulled Plaintiff's Travel Pass because Plaintiff was a commuter and she thought that since 12/1/2020 Plaintiff had been commuting from Cleveland to SFO. (Ex. M, Petani 66:5-7 ["Oh, my God. [Plaintiff] is flying with Covid"].) Again, this is a lie. Petani had ready access to Plaintiff flight schedule and knew that Plaintiff had only worked flights out of Cleveland. Prickett never asked Petani whether there was a problem between Plaintiff and Petani. (Ex. N, Prickett Depo, 139:12-16.)  Again, the discrimination, retaliation, harassment element was irrelevant since United wanted to terminate Plaintiff.

Based on Petani's lie on 12/21/2020 Prickett, with the assistance of *Elizabeth Cavanagh, Senior Manager Labor Relations*, issued a Letter of Investigation (LOI) to Plaintiff. (Ex. AAA.) At the same time the LOI was emailed to Plaintiff, Prickett had no idea of the "details as to the date of her [Plaintiff's] Return to Work, and when she first started showing symptoms?" (Ex. BBB)  Pickett did not recall receiving an answer to his query. (Ex. N, Prickett Depo, 165:8-18.)

**H. First Investigatory Meeting.**

---

13 Petani's false statements are consistent with White's experience that Petani was dishonest.  (Ex. Q White Depo, 37:22 – 38:7.)

Once released from quarantine by the county on 11/18/2020, Plaintiff did not return to work because she still had brain fog and her doctor wanted her to stay out until 12/1/2020. (Ex. O, Salas Depo, 250:7-12; 250:21-251:1.)  Had Plaintiff returned to work impaired, she could have been terminated. (Ex. J, Castelli Depo, 61:8-62:14.)

Castelli took notes for United at the first investigatory meeting on 12/23/2020. (Ex. III.) Castelli's notes reflect that Plaintiff was accused of lying on the Ready to Fly Checklist. (Ex. J, Castelli Depo, 76:15-18; 78:1-3.) Plaintiff responded that she had the COVID test on the 26th and it had been more than 21 days since her diagnosis and that as of November 9th she knew she was not contagious per her doctor. (*Id.*, 82:3-16.) ***Plaintiff told Prickett that when she traveled to Florida she continued to have fatigue, brain fog and cough but that she was no longer contagious***. (*Id.,* 82:16-22; Ex. III.)

Prickett then accused Plaintiff of returning to work without clearance which clearly was not true. (*Id.,* Castelli Depo, 79:9-13.)

Prickett falsely told Plaintiff that she was not supposed to travel when sick. (*Id.,* 83:20-21.)  Plaintiff told Prickett to look at the schedule and he would see that Joanna had released her on the 12th through December 1. (*Id.,* 83:22-25.) Plaintiff ended by saying that she would not risk her job for a trip to Florida. (*Id.,* 84:4.)

At the end of the meeting Plaintiff was asked to write a statement briefly summarizing the events of the meeting. (Ex. LLL.) Plaintiff's write up did not mention her post viral symptoms – which appears to be the only basis for this motion. Nonetheless, notes of the meeting are clear that Plaintiff told Prickett that she continued to suffer post-viral symptoms.

**I. Prickett Consults with the DRP after the First Investigatory Meeting.**

Prickett claimed at deposition that he did not review any medical notes related to Plaintiff even though the issue was poignantly medical. (Ex. N, Prickett Depo, 90:2-92:13.) This testimony is not true. On 12/29/2020 Plaintiff emailed Prickett Dr. Jurek's 12/23/2020 note explaining that Plaintiff was no longer contagious on 11/9/2020 and that she was released back to work on 12/1/2020. (Exs. JJJ & NNN.) Not only did Prickett receive the note but he forwarded to members of the Discipline Review Committee (DRE) on 1/4/2020 with the note "Received ***additional*** Dr. Note." (*Id.*)

The DRP is a panel of United's managers in HR, legal, employee relations and labor relations who review termination cases to ensure consistency in application of the rules of

discipline or termination. (Ex. I, ByunRiedel Depo, 19:17-24.) The testimony has been that the supervisor decides whether to terminate but the DRP ratifies the termination to ensure consistency in the application of United's policies. (Ex. N, Prickett Depo, 196:21-197:6.)

Plaintiff contends that the DRP was involved in making the decision to terminate through, at a minimum, Elizabeth the ***Senior Manager of Labor Relations***. (Ex. N, Prickett Depo, 208:3-16.) Cavanagh is not at SFO but at United's corporate office in Illinois. (*Id.*) United's headquarters and principal place of business is located in Chicago Illinois. United's directors and executives work at, direct, and coordinate United's key business operations from the Illinois headquarters. (Ex. ZZZ.) The members of the DRP are managing directors (including Cavanagh) who set and ensure compliance with policy. (Ex. I, ByunRiedel Depo, 22:19-23:11; Ex. N, Prickett Depo, 199:12-15.)

Cavanagh was involved from the beginning – she participated in drafting the Letter of Investigation. (Ex. NNN.) Cavanagh also participated in drafting the Termination Letter which was electronically passed between Prickett and Cavanagh before it was completed. (Ex. RRR.) Prickett did not save the different drafts of the termination letter making it impossible to definitively determin which portions were drafted by Prickett/Cavanagh. (Ex. N, Prickett Depo, 208:17-209:7.) However, Cavanagh's email stating that she "changed quite a bit of the wording and highlighted some areas for you to address" is telling. (Ex. RRR.)

White was the Local executive Council President for Council 11 in San Francisco. (Ex. Q, White Depo, 10:19-25.) She led the AFA for United's SFO-based FAs. (*Id.*, 11:1-3.) White testified that the investigation was ridiculous, that Plaintiff had done nothing wrong; that Plaintiff was a longtime employee with a clean history; and that United's aggressive discipline actions in this case were very harsh, *i.e.* Plaintiff was being treated differently than what White expected under the circumstances. (Ex. Q. White Depo, 172:9-173:5.) There are triable issue of material fact as to why United was so harsh in assessing Plaintiff's conduct. The decision to terminate Plaintiff was not made at SFO but involved Labor Relations. (*Id.,* 173:24-174:7). White's opinions should carry significant weight because of her decades of experience in leadership at the AFA and her routine communications with the SFO leadership. (*Id.,* 29:14-30:18). White testified that the DRP and in particular Labor Relations were definitely other decision-makers besides Prickett. (*Id.,* 174:3 – 22).

Cavanagh was involved in drafting the Appeal Decision as well. (Ex. SSS.)

### J. Second Investigatory Meeting 1/12/2021 - Prickett Apologizes to Plaintiff for Terminating Plaintiff and Tells Her that she Should Appeal the Decision.

At the second meeting Prickett stated "[i]n reviewing your work history, you're right – great record." (Ex. OOO.) However, Prickett continued, "The company's expectation is that when you are paid to be out, you need to be legitimately sick. ***You did have lingering problems*** with Covid." (*Id.*) After discussing perceived inconsistencies between having brain fog and travelling to Florida, Prickett concluded "I do have to separate you from the company effective today. I'm sorry, … I highly encourage you to appeal this, …" (*Id.*)

### K. COVID-19 Related Terminations.

United's assertion that it fired only Plaintiff at SFO in connection with COVID leave is irrelevant and wrong. (Sagheb Dec., ¶19-20.)  United does not operate only out of SFO and in this case Plaintiff asserts that SFO was not only decision maker. Many FAs over the age of 40 were terminated in connection with COVID leave. (Ex. BBBB, CCCC.)[14]

### III. Argument

### A. There are Triable Issues of Material fact as to Plaintiff's Discrimination Claim.

#### 1. Plaintiff's COVID constituted a Disability under FEHA

As a preliminary matter, the Court should note that the cases cited by Defendant were decided primarily in ADA cases. "[T]he California Supreme Court has held that the ADA's 'substantial limitation' test does not apply to the FEHA." *Diaz v. Fed. Express Corp.,* 373 F. Supp. 2d 1034, 1052 (C.D. Cal. 2005)[15] Moreover there is no evidence that the Legislature intended to institute a durational *requirement* in establishing that a defendant is disabled under the FEHA. *Id.* "The Legislature has declared that the FEHA is intended to protect employees 'from discrimination due to an actual or perceived physical ***or mental*** impairment.' (§ 12926.1, subd. (b.).)" *Wallace v. Cnty. of Stanislaus* (2016) 245 Cal. App. 4th 109, 134. FEHA defines the phase "major life activities" to include physical, mental, and social activities, and those that prevent or inhibit "working," and that courts should construe the phrase broadly. Gov. C §

---

14 More generally speaking, United's intolerance for employees with the COVID-19 illness is well known. Aside from the speech by Ted Cruz as recited at  ¶15 of the FAC, United placed its employees who refused COVID-19 vaccinations on indefinite leave without pay. *Sambrano v. Unite Airlines, Inc,* USDC, Northern District of Texas, 4:21-cv-01074-P. (Ex. VVV, WWW.)

15 The Legislature's instructions in section 12926.1 is that the FEHA definition of "disability" is to be construed more broadly than the definition of "disability" under the ADA is of import in this context. *Diaz, supra,* 373 F. Supp. 2d at 1053.

12926(m)(1)(B)(iii). 2 Cal Code Regs §11065(1)(1)-(2) provides specific examples of major life activities which includes, "***concentrating, thinking, communicating, interacting with others*** and working." The operation of major bodily functions includes such functions as the brain and neurologic system within the body system.

"An individual diagnosed with COVID-19 who experiences ongoing but intermittent multiple-day headaches, dizziness, brain fog, and difficulty remembering or concentrating, which the employee's doctor attributes to the virus, is substantially limited in neurological and brain function, concentrating, and/or thinking, among other major life activities."[16]

A condition need not be permanent to qualify as a disability. Even short term conditions, if they limit a major life activity, may qualify for protection. *Diaz v. Federal Express Corp.,* 373 F.Supp.2d 1034, 1051-53 (C.D. Cal. 2005). Whether an ailment qualifies as a disability is evaluated on a case-by-case basis. In *Roman v. Hertz Local Edition Corp.,* S.D. California, No. 20-cv-2462-BEN (AGS) (May 16, 2022)*,* the court found that "COVID- 19 is known to produce in some individuals what is termed as 'long- haul COVID- 19. That type of COVID – 19 infection may well fall within FEHA's definition of a disability." This court looked to the *DFEH Employment Information on COVID- 19* as guidance and concluded that "the guidance logically reasons that FEHA requires that COVID-19 infections be analyzed on a fact- based determination to decide whether they qualify as a disability." *Id.* United's snippets and generalizations from *West v. Scott Lab'ys, Inc.,* No. 23-15502, 2023 WL 6172009 (9th Cir. Sept. 22, 2023) and *Areopaja v. Morrison Mgmt. Specialists*, CV 21-4739-RSWL-JPRx, at *11 (C.D. Cal. Mar. 14, 2023) are unpersuasive. *West* has no application here as the Plaintiff did not contract COVID. Likewise the Plaintiff in *Areopaja* had neither long-term nor severe COVID.

This Court has already determined that there is no reason for COVID illness to be exempt from the usual rule that the asserted disability be evaluated on a case-by-case basis. (Dkt 36.) This Court agreed with the reasoning in *Roman* where the court concluded that when COVID-19 "presents with temporary symptoms akin to the common cold or seasonal flu," it will "fall outside FEHA definition of ailments considered a disability. *Id.* at*5. On the other hand, "for some individuals COVID-19 can cause exceedingly severe, even deadly, symptoms with long durations that would easily qualify as a FEHA disability." *Id.* And what has been termed "long-haul COVID-19 … may

---

16  *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/wysk/what-you-should-know-about-COVID-19-and-ada-rehabilitation-act-and-other-eeo-laws/ (last updated July 12, 2022).

well fall within FEHA's definition of a disability." *Id.* at*6. This court went on to discuss the EEOC's guidance as did the court in *Brown v. Roanoke Rehab. & Healthcare Ctr.*, 586 F. Supp. 3d 1171, 1175-76 (M.D. Ala. 2022).

In *Brown* Plaintiff alleged that she had an actual disability because she was COVID-19 positive and suffered from severe weakness, fatigue, brain fog, high blood pressure, cough, difficulty breathing, fever, and swollen eyes, and that CDC-guidance and company policy required that she isolate for 14 days. The Court agreed that Brown stated sufficient facts to allege that she had physical or mental impairments from COVID-19 and that those impairments substantially limited recognized major life activities. The *Brown* Court relied on "recent guidance by the Department of Health and Human Services and Department of Justice indicates that certain forms of COVID-19 may be considered a disability under the ADA. ...As this guidance details, COVID-19 "is a physiological condition affecting one or more body systems." *Id.* at 3. Accordingly, COVID-19 may be a "physical or mental impairment under the ADA." *Id.* Additionally, the guidance states that certain forms of COVID-19 can "substantially limit major life activity," such as one's … brain function, even months after first being infected." *Brown, surpa,* 586 F. Supp. 3d at 1176-77.

Defendant argues that brain fog resulting from COVID is not a condition that limits a major life activity. Dr. Jurek disagreed and placed Plaintiff off work for 36 days; Dr. Raskin also disagrees, as did the court in *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen.*, 50 F.4th 1126, 1156 (11th Cir. 2022), wherein the court likened brain fog from COVID-19 to neurological conditions such as Alzheimer's.

By mid-2020 there was medical evidence published by the CDC recognizing that a segment of the COVID infected but not-hospitalized COVID patients did not return to baseline even after symptoms of illness subsided. (Ex. B.) The study showed that people over the age of 50 were more likely to be effected. A later study confirmed these findings. (Ex. C.)

As to United's argument that Plaintiff's symptoms were mild because she did not see a doctor or take medication, there was no medication in October, 2020. Dr. Jurek mentioned Paxlovid at her deposition but that drug was not granted FDA Use Authorization until December 22, 2021[17]. Two weeks after Plaintiff contracted COVID (10/26/2020-11/9/2020) Plaintiff

---

[17]  https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-oral-antiviral-treatment-covid-19

continued to suffer from inability to concentrate and sustained fogginess such that her physician was concerned about her return to work and directed Plaintiff to stay off work until 12/1/2020, another 3 weeks. Dr. Jurek's direction to stay off work was specifically directed to the fact that it was dangerous for Plaintiff to serve as a FA with brain fog which would interfere with her ability to carry out her duties, including her duty to service, care for and protect passengers and crew members in the event of unforeseen events. (Ex. K, Jurek Depo, 129:20-130:8.)

Plaintiff was able to return to work on 12/1/2020 but not without restrictions as advanced by Defendant. Plaintiff recognized her on-going symptoms and signed up for the NAL program which only allowed 35 hours of flying time. (Salas Dec., ¶13.)

In addition all the flights Plaintiff picked up until she was terminated were based out of Cleveland so that she could avoid flying to and from SFO.

### 2. *IF* the Pass Travel Benefit is Limited to Healthy Employees as Suggested by the Motion, it is Discriminatory on its Face – Direct Evidence of Disparate Treatment.

United argues "the undisputed record shows there is no direct evidence of discrimination". (MP, 12:5-6.) If it is United's contention that Pass Travel benefits are only for the benefit on non-disabled employees, Plaintiff disagrees.

A rule or policy may be discriminatory *per se* if it is facially discriminatory, has a disparate impact on a protected class, or is not job-related or consistent with business necessity. In *Johnson Controls, Inc. v. Fair Employment Housing Comm'n* (1990) 218 Cal.App.3d 517, the court held respondent's fetal-protection policy invalid under FEHA. "In this case, we are concerned with an employer's gender-based fetal-protection policy. May an employer exclude a fertile female employee from certain jobs because of its concern for the health of the fetus the woman might conceive?" *Auto. Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 190 (1991) The employer may not.

"Once a plaintiff has established that she is a qualified individual with a disability, she may show discrimination in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate. *See Sieberns v. Wal–Mart Stores, Inc*., 125 F.3d 1019, 1021–22 (7th Cir.1997)." *Hoffman v. Caterpillar, Inc.,* 256 F.3d 568, 572 (7th Cir. 2001) In *Hoffman*, Plaintiff's supervisor admitted that he refused Hoffman's requests for high-speed scanner training because of her disability. *Id.* Here, United appears to be admitting (contrary to

the provisions of the Pass Travel) that had Plaintiff requested permission to travel (she did not) it would have been denied because she was on sick leave.

In *Trans World Airlines, Inc. v. Thurston,* (1985) 469 U.S. 111, 120–21, 105 S. Ct. 613, 621, the Supreme Court held that an employer's policy conditioning employees' transfer rights depending on their age was discriminatory on its face and thus direct evidence of disparate treatment. In *Thurston* TWA's transfer policy denied 60-year-old captains a "privilege of employment" on the basis of age. "Captains who become disqualified from serving in that position for reasons other than age automatically are able to displace less senior flight engineers. Captains disqualified because of age are not afforded this same "bumping" privilege. Instead, they are forced to resort to the bidding procedures set forth in the collective-bargaining agreement. If there is no vacancy prior to a bidding captain's 60th birthday, he must retire. The Act does not require TWA to grant transfer privileges to disqualified captains. Nevertheless, if TWA does grant some disqualified captains the "privilege" of "bumping" less senior flight engineers, it may not deny this opportunity to others because of their age. In *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), we held that "[a] benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free ... not to provide the benefit at all." *Id.,* at 75, 104 S.Ct., at 2233–2234. This interpretation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA "were derived *in haec verba* from Title VII." *Lorillard v. Pons, supra,* 434 U.S., at 584, 98 S.Ct., at 872.

Here, United admits that it terminated Plaintiff because she used an employment benefit, *i.e.* her Pass Travel, while she was out on sick leave. While United terms this "sick abuse" United identifies no circumstances under which any employee out on sick leave may use the Pass Travel. Indeed, Krabbe testified that FAs are not allowed to use Pass Travel while out sick and Petani testified that she has never seen a request for travel while on sick leave approved by United. (Ex. L, Krabbe Depo, 66:22-67:22; Ex. M, Petani Depo, 187:3-25[18]) In essence Krabbe makes the argument made in *Johnson Controls* that the restriction of travel while on sick leave is really a protection of the employee who should be at home recuperating.

---

18  Petani testified she had seen only one exception to this rule which related to a severely injured FA who was required to see physicians in a different state.

Dr. Jurek testified that convalescence means not a lot of active participation in anything, but it doesn't mean that Plaintiff was confined to home and it doesn't mean that she had to lay on the couch. (Ex. K, Jurek Depo, 53:19-54:3.) Dr. Jurek testified that there was no reason why Plaintiff could not travel to Florida during her convalescence from brain fog. (*Id.,* 54:16-17) The only directive Plaintiff was given was not to return to work for three weeks or until 12/1/2020. (*Id.,* 48:15-21; 49:22-23; 50:24-51:1; 51:20-22.)

United may assert that the policy that "if you are too sick to work you are too sick to travel" is a business necessity because United does not want to pay FAs sick pay if the FA is well enough to work. Likewise the argument in *Johnson Controls* that they wanted to avoid liability for children born with defects as a result of permitting their mothers to work. But the COVID related pay protection only extended until the state of emergency expired. (Ex. DD.) Normally, sick leave is controlled by Section 13A, JCBA[19] which says nothing about limiting activity while on sick leave.

Pass Travel is a benefit of employment, except when the employee becomes sick or disabled. Setting aside the fallacy that "if you're too sick to work, we assume that you're also too sick for leisure travel" the fact is that withholding a benefit from an employee on the basis of a protected category is per se and direct evidence of discrimination.

Where a plaintiff offers direct evidence of discrimination that is believed by the trier of fact, the defendant can avoid liability only by proving the plaintiff would have been subjected to the same employment decision without reference to the unlawful factor. *Miles v. M.N.C. Corp.* (11th Cir.1985) 750 F.2d 867, 869; *Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 244–245, 109 S.Ct. 1775; see, *Trans World Airlines, Inc. v. Thurston* (1985) 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 [direct evidence of discrimination renders shifting burdens of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 inapplicable]. Here, Plaintiff's termination letter reflects that the only reason she was terminated was because she used her Pass Travel while out sick. (Ex. QQQ.) There is and was no other reason to terminate Plaintiff.

### 3. "But For" or "Because of" Does not require Showing a Discriminatory Motive in Disability Discrimination

---

19 Section 13A.1. of the JCBA provides: "Flight Attendants shall be credited with four hours (4:00) of sick leave credit in their sick leave bank, and four hours (4:00) of sick leave credit in their occupational injury leave bank, for each month during their employment to be credited on a quarterly basis …"

"California law does not require an employee with an actual or perceived disability to prove that the employer's adverse employment action was motivated by animosity or ill will against the employee. Instead, California's statutory scheme protects employees from an employer's erroneous or mistaken beliefs about the employee's physical condition. (§ 12926.1, subd. (d).) In short, the Legislature decided that the financial consequences of an employer's mistaken belief that an employee is unable to safely perform a job's essential functions should be borne by the employer, not the employee, even if the employer's mistake was reasonable and made in good faith." *Wallace v. Cnty. of Stanislaus* (2016) 245 Cal. App. 4th 109, 115. As such, in a disability discrimination claim, the term "animus" does not necessarily denote animosity or if ill will toward the *plaintiff*, but instead toward the *disability*. California Practice Guide, *Employment Litigation*, 7:368.

In an action alleging FEHA violations as a result of disability discrimination "[u]ltimately, plaintiff must show that he (1) suffered from a disability or was regarded as disabled; (2) was otherwise qualified to do the job; and (3) suffered an adverse employment action because of [his] disability." *Diaz v. Federal Express Corp.,* 373 F.Supp.2d 1034 (C.D.Cal.2005).

There are triable issues of material fact related to the causation element of Plaintiff's disability discrimination claim. Setting aside the fact that United shortened Plaintiff's intial leave time by three days without informing her, there is no question that Plaintiff's return paperwork was received by United no later than 11/12/2020. Nor is there any medical evidence to dispute Dr. Jurek's determination that Plaintiff needed to remain off work until 12/1/2020. There is no medical or other evidence that Plaintiff's convalescence required her not to fly. All of the evidence consistently shows that FAs were permitted to use their Pass Travel while on sick leave. Finally, there is no evidence that when Plaintiff flew in November or when she started back to work in December she was contagious and United had evidence otherwise.

Petani's accusation on 11/9/2020 that Plaintiff was abusing sick leave had no basis. (Ex. O, Salas Depo, 171:9-12.) Petani said United was taking COVID sick leave "very seriously" and people were "being terminated for claiming COVID falsely". (*Id.*, 170:10-16.) United tries to explain these warnings as part of "wellness calls". They were not.[20] According to Prickett, a

---

[20]  Castelli testified that he and Petani created a log or spreadsheet that documented "what kind of conversation it was when we tried to contact the person." (Castelli Depo, 20:1-9; 21:22-25.) United never produced this electronically created log or spreadsheet pertaining to the calls between Petani and Plaintiff claiming it was "lost". (*Id.,* 21:14.)

wellness call consisted of acknowledging that the FA was out sick, wishing them well and lending support. (Prickett, 17:1-12.) Moreover, the genesis of the call on 11/9/2020 was not Petani but Plaintiff who wanted  to make sure that her employer was updated as to her status.

After the accusation from Petani Plaintiff's schedule was manipulated on 11/12/2020. 11/13/2020 and 12/1/2020.

United argues that the court should consider only what Plaintiff said to Prickett at the first meeting and ignore the medical records provided in the investigation process. United's artificial narrowing does not benefit United since the notes of the 1st meeting clearly reflect that Plaintiff identified her brain fog (post-viral syndrome) which was acknowledged by Prickett during the 2nd meeting. Moreover on 12/29/2020 Plaintiff sent another note from Dr. Jurek.

Motivation and bias are always issues in investigations because whether or not an employee would have been investigated, disciplined or terminated. *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal. App. 5th 1168, 1184–85. Prickett never questioned Petani's motivation in bringing Plaintiff's case to him to investigate. Nor did he question the internally inconsistent emails about Plaintiff calling for permission to fly.

United may argue that evidence of travel to Florida, with or without use of the Pass Travel, was a sufficient basis for termination based on abuse of sick leave. But Plaintiff was out sick based on her doctor's directive which she followed; there is no limitation in the JCBA as to how Plaintiff must spend the time she takes off as sick; and Dr. Jurek's testimony is consistent that Plaintiff could travel to Florida and convalesce at the same time.

### 4. There are Triable Issues of Material Fact re Plaintiff's "Regarded as" Claim

United's circular and inaccurate argument that because COVID is not a disability the employer did not act in a way to indicate that it believe an ailment to be potentially disabling makes little sense. Under FEHA, an actual or existing disability is not necessary. The FEHA defines "disability" to include (1) "[h]aving a record or history of a disease, disorder, condition, … or health impairment [that constitutes a physical disability], which is known to the employer"; (2) "[b]eing regarded or treated by the employer . . . as having, or having had, any physical condition that makes achievement of a major life activity difficult"; or (3) "[b]eing regarded or treated by the employer . . . as having, or having had, a disease, disorder, condition, … or health impairment that has no present disabling effect but may become a physical disability." (§ 12926, subd. (k)(3)-(5).) *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 345.

For reasons previously stated there are triable issue of material fact as to whether Plaintiff was discriminated against based on the perception that she was at greater risk than younger employees who did not require an extended leave to recover from COVID. As for returning Plaintiff to work, Defendant's argument that United readily returned Plaintiff her to work on 12/1/2020 is disingenuous. Aside from material disputes as to how and why Plaintiff's 12/1/2020 trip was taken away, permitting Plaintiff leave only to terminate her because of activities during the leave is not an accommodation of the disability or perceived disability.

     5.  **There are Triable Issues of Material fact as to Plaintiff's Discrimination Claim based on Age**

Defendant asserts that Plaintiff cannot prove that she (1) performed her job satisfactorily and (2) was replaced by substantially younger employees with equal or inferior qualifications or under circumstances otherwise giving rise to an inference of discrimination. *Merrick v. Hilton Worldwide,* 867 F.3d 1139, 1146 (9th Cir. 2017).

United's basis for asserting that Plaintiff failed to perform her job satisfactorily is (1) Plaintiff violated work rules by using her Pass Travel while out sick and (2) among the SFO FAs out on COVID leave Plaintiff was the only one terminated.

Plaintiff did not fail to perform her job satisfactorily by using her Pass Travel.[21]

As repeatedly reflected in AFA publications Pass Travel was available for use by FAs since at least 4/18/2018; FAs were permitted to travel with *no* requirement to obtain prior approval from a supervisor while on sick leave. (Ex. V-BB.) The same rule was testified to by Prickett who is supposedly the only person that made the decision to terminate Plaintiff. (Ex. N, Prickett Depo, 82:9-11.) Plaintiff was fired for using her Pass Travel while of sick leave even though the rule is that she is allowed to use her Pass Travel while on sick leave.

As for the statistics of terminations from SFO, no data is provided as to how long each of the over-40 FAs were out on leave. In any case United is not just its SFO base. Overall, United terminated at least a dozen over-40 COVID leave employees. The correlation between their extended leave and termination is unknown and since the relevant documents were not produced until after close of discovery the reliability of the data is at best questionable. (Sagheb Dec., ¶20.)

The 4th prong of the test of age discrimination is sometimes satisfied by showing that a younger person replaced the older employee but while "the characteristics of the employee

---

21  Of note is that the 2020 cost of an airline ticket from Cleveland to Orlando was between $40-$50. Ex. UUU, Salas Dec., ¶34. If Plaintiff were seeking to hide her trip from United, it would not have cost her much.

replacing a discharged or demoted employee are certainly relevant in evaluating an employer's motive for an employment decision, we believe those characteristics *go to the weight of the evidence* rather than its *legal sufficiency*." *Begnal v. Canfield Associates Inc.* (2000) 78 Cal.App.4th 66, 74-76. Here, (1) because United is a mass employer; and (2) because it would violate the AFA's seniority rules for a younger employee to replace Plaintiff, it would be impossible for Plaintiff to prove that any one FA hired after Plaintiff was terminated replaced her and obtained her line. In fact, because of seniority, that cannot happen. FAs have the seniority they have based on the year they were hired. The best that Plaintiff can do is show that in 2020 United reported employing 16,507 FAs; in 2021 United reported employing 21,678 FAs; and in 2022 United reported employing 23,065 FAs. (Ex. S, T and U.) By reasonable inference, most of the newly hired FAs were under the age of 40 and some were assigned to United's SFO base.

But the stronger evidence is the fact that Plaintiff was an excellent employee with 28 years of seniority; she had never been in trouble with United; and the trouble at issue here was manufactured by Petani. There are triable issues are to why Petani went out of her way to pull Plaintiff's Travel Pass, why she claimed that Plaintiff reported being sick and flying (which Plaintiff did not), why Petani went out of her way to tell Jacobs that Plaintiff had called her for permission to fly (never happened); the myriad of other events which occurred during Plaintiff's COVID leave that have not been explained. There are triable issues of material fact as to Plaintiff's age discrimination claim.

**B.      There are Triable Issues of Material fact as to Plaintiff's Retaliation Claim**

A plaintiff makes a prima facie case for retaliation under FEHA by alleging that (i) she engaged in protected activity; (ii) she was thereafter subjected to an adverse employment action; (iii) a causal link existed between the protected activity and the adverse action. *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 CA.4th 1028, 1042.

Plaintiff asserts that Defendant retaliated against her for requesting an extension of her original COVID leave which in any event United reduced by three days without giving Plaintiff notice. United did not accommodate Plaintiff's disability. Requesting an accommodation, regardless of whether the request is granted is a protected activity. Gov't Code §12940(m)(2); *Tripton v. Airport Terminal Servs., Inc.* No. CV1809503ABJEMX, 2019 WL 4231234, AT *9 (C.D. Cal. June 25, 2019) (finding plaintiff alleged enough facts to state a retaliation claim based on a termination for taking too much time off). Here, there was no appreciable time between

Plaintiff's request for sick leave due to COVID and her termination based directly on her activities while on leave with COVID and explicitly based on the claim that Plaintiff should have come back to work earlier. Plaintiff was terminated because she requested time off (an accommodation) to recover from COVID (a disability). Accordingly, Plaintiff's retaliation claim must remain.

United argues that Plaintiff cannot establish a link between taking 36 days off for COVID illness and being terminated for using her Travel Pass. Wrong. Plaintiff asserts that the Travel Pass issue was pretext for the termination. United's efforts to shrink Plaintiff's COVID leave were in play from the beginning. Demanding that Plaintiff return on 11/9/2020 would have required Plaintiff to return while she was still symptomatic. Dr. Jurek extended Plaintiff's leave to 12/1/2020, a fact Plaintiff communicated to both Joanna and Petani on 11/9/2020. On 11/9/2020 Plaintiff was accused of falsifying COVID sick leave – the protected activity. After working some trips, accommodating her own disability with the NAL program, Plaintiff was accused of falsifying the Ready to Fly Check list as a basis for investigating and terminating her even though that form was prepared by Plaintiff as a passenger, not an employee. The Ready to Fly Check list is a perfect example of United grappling to find a basis to fire Plaintiff.

Then of course there are questions about how or why Plaintiff's Pass Travel was pulled. There are also questions about why Prickett never sought a clear understanding of why Petani was seeking investigation of Plaintiff and why she lied in her emails about the events during Plaintiff's leave.

Finally, at the time Prickett was an employee of 29 years (Ex. N, Prickett Depo, 6:20-23) *and* according to Prickett, one of a select few at the time who could perform investigations that would lead to termination. (*Id.,* 132:22-133:5.) Yet Prickett was not trusted to drafted the letter of investigation or the termination letter without considerable input from Cavanagh.

There are triable issues of material fact as to whether Plaintiff's termination constituted retaliation for the extended COVID leave.

### C.     United's Purported Legitimate Ground for Termination were Pretextual

For reasons previously set forth there is no evidence that Plaintiff made a false claim of leave. The leave was directed by Plaintiff's physician who believes that returning to work earlier than 12/1/2020 would be dangerous. Nor did Plaintiff abuse Pass Travel which was available to her during her sick leave. United knew these facts when it fired Plaintiff for sick abuse.

*Cobb v. Alaska Airlines, Inc.*, No. 22-35240, at *4 (9th Cir. Mar. 23, 2023) is inapplicable here because Alaska had a policy against use of travel privileges while on FMLA leave. United has no such restriction on use of Travel Pass which United admits Plaintiff could use while on sick leave. United's determination that the Travel Pass was not appropriately used because Plaintiff could have returned to work after 11/17/2020 is contrary to the medical evidence.

United asserts that it had a "legitimate expectation" that Plaintiff would recuperate at home. (MP, 18:17-19.) United points to nothing in the JCBA, WTG or Pass Travel that requires at home recuperation.

Finally, United continues to use word games to assert its position that Plaintiff both had symptoms for purposes of the Ready to Fly checklist but did not have symptoms for purposes of being on sick leave. The simple truth is Plaintiff not contagious when she flew to Florida.

United's baseless reasons for terminating Plaintiff would be sufficient if honestly believed but ignoring the evidence, including the physician's note, is not an honest belief. Nor are United's reasons unrelated to the prohibited bias. *Guz v. Bechtel Nat'l, Inc., supra,* 24 Cal.4th at 358. Where other evidence supports an inference of discriminatory motive,  proof of the employer's reasons are illogical and inconsistent may "considerably assist" plaintiff's case because it suggests the employer had cause to hide its reasons. *Guz v. Bechtel Nat'l, Inc., supra,* 24 Cal.4th at 361. *McKinney v. Office of Sheriff of Whitley County* (7th Cir 2017) 866 Fed.3rd 803, 810 "[t]he most striking features of this lawsuit are the sheer number of rationales the defense has offered for firing plaintiff and the quantity and volume of evidence and Plaintiff has collected to undermine the accuracy and even the honesty of those rationales". Same is true here.

### D.     If the Court determines United has presented a Legitimate Ground for Termination Plaintiff can show the reasons to be Pretextual

Plaintiff may satisfy the burden of showing pretext by proving that the legitimate reasons offered by defendant were false, creating an inference that those reasons were merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Products, Inc., supra*, 530 US at 142; *Guz v. Bechtel Nat'l, Inc., supra,* 24 Cal.4th at 356. No additional, independent evidence of discriminatory motive is required. *Reeves, supra*, at 148. Pretext means a dishonest explanation. *O'Regan v. Arbitration Forums, Inc.* (7th Cir. 2001) 246 Fed.3rd 975, 983. Proof that the employer's criticism of plaintiff's job performance was unfounded raises a question of fact as to the credibility of the employer's explanation for any adverse action taken against plaintiff. This evidence coupled with the evidence supporting plaintiff's prima facie case may support a finding

that the employer stated reasons were pretextual. *Reeves v. Sanderson Plumbing Products, Inc., supra*, 530 US at 142.

Here, there is significant evidence that the purportedly legitimate reasons offered by defendant are false. To start with, the WTG do not provide that FAs may not travel while on sick leave. The witnesses and documents confirm[22] that FAs may travel while on sick leave. The assumption in the WTG that "if you're too sick to come to work, then you're too sick to travel" is a generalization, not a policy, subject to case by case determination.

Plaintiff came under investigation for false reasons fabricated by Petani. It was Prickett's job to discern that falsity but he failed to do so in his consultations with Petani. (Ex. N, Prickett, 135:25-136:9.) Prickett could have gotten to the truth from Petani but Prickett elected not to do any investigation to determine the veracity of Petani's statements. (*Id.,* 281:19-24.) Prickett denied reviewing medical records in association with the investigation– an odd fact not to recall doing in a sick leave investigation where symptoms is the issue. (*Id.,* 90:2-92:13.)

Petani and Prickett claim they had no knowledge that older Americans were at greater risk for contracting and less able to recover from COVID. (Petani 219:4-19.) Both Petani and Prickett live in California making their testimony unbelievable.  (Ex. A-G.)

Plaintiff agrees with United's argument that the time frame – December 2020 – should be considered to understand whether COVID was having a greater effect on seniors than the younger population. Starting in July 2020 the CDC was publishing the greater effects of post-viral symptoms among non-hospitalized patients. (Ex. A-G.) Likewise, WHO, the United Nations, the Los Angeles Times and Governor Newsom were providing nearly daily reminders of the greater impact on persons 50 years and older.

It is completely irrelevant and untrue that Plaintiff did not explain the difference between COVID symptoms and post viral symptoms. At the 2nd meeting Prickett said "you did have lingering problems with Covid". Prickett was provided Jurek's note that specifies Plaintiff was not contagious after 11/9/2020 and off for a different reason, post-viral syndrome until 12/1/2020.

United's purported justifications ("they didn't know") are dishonest which renders them pretext. The employer could not reasonably believe that Plaintiff could return to work before directed by her physician.

---

22  Ex. I, ByunRiedel, 126:21-23; Ex. Q, White 81:16-82:5; 77:24-25; Ex. N, Prickett, 82:9-11.

An alternative means for establishing pretext[23] in disparate treatment cases is to show that others in similar situations were treated differently. White testified that she had handled about half a dozen Pass Travel cases but United did not terminate most of the employees investigated. In fact, White could recall only one instance in which the employee accused of Pass Travel violations was terminated. (Ex. Q, White, 54:11-22.) As for Castelli's testimony that he terminated another FA for flying to Puerto Vallarta, the facts in that case made it clear that the Puerto Vallarta trip was the last straw. (Castelli Depo, 15:18-16:4; 51:14-52:12.) Castelli saw no similarities between the conduct of this other FA and Plaintiff. (*Id.,* 55:11-16.)

**E.    There are Triable Issues of Material Fact as to Plaintiff's Harassment Claim**

The employer is strictly liable for harassment by a supervisor. *State Dept. v. Sup. Ct* (2003) 31 Cal.4th 1026, 1040. Hostile work environment claims have been recognized on the basis of disability under FEHA. *Lawler v. Montblanc* (9th Cir. 2013) 704 Fed.3rd 1235, 1244-1245. Hostile work environment claims based on age are forbidden under the FEHA which expressly forbids harassment based on age. Gov. Code §12940(j). The same standards governing sexual harassment govern claims based on age. *Juell v. Forest  pharm* (ED CA 2006) 456 F.Supp.2d 1141, 1157. Because of page limits, Plaintiff's highlights of the relevant facts are located in the related opposition to the MSJ filed by Petani.

**1. Petani's Conduct cannot be explained as Personnel Management Actions.**

Under some circumstances, such as that presented herein, personnel management decisions may form the basis of a harassment claim. "Although discrimination and harassment are separate wrongs, they are sometimes closely interrelated, and even overlapping, particularly with regard to proof*." Roby v. McKesson Corp.* (2009) 47 Cal. 4th 686, 707–08, as modified (Feb. 10, 2010); *Miller v. Dep't of Corr.* (2005) 36 Cal. 4th 446. When the harasser is a supervisor, the employer is strictly liable for the supervisor's actions." *Roby,* 706–07. Harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace. *Id. at* 707. Defendants cannot hide behind the personnel management defense for all acts of hiring, firing, promotions and demotions because the same conduct may evidence harassment. *Roby v. McKesson Corp.* (2010) 47 Cal. 4th 686, 705, as modified (Feb. 10, 2010).

The relevant decisions here are *Miller* and *Roby.* While discrimination refers to bias in the exercise of official actions on behalf of the employer and harassment refers to bias that is

---

23 *Wills v. Superior Ct.* (2011) 195 Cal. App. 4th 143, 172, as modified on denial of reh'g (May 12, 2011) ["Showing disparate treatment or policy enforcement is a permissible means to establish pretext."]

expressed or communicated through interpersonal relations in the workplace the *Roby* and *Miller* decisions show that "in some cases the hostile message that constitutes the harassment is conveyed through official employment actions, and therefore evidence that would otherwise be associated with a discrimination claim can form the basis of a harassment claim." (Id., 708, emphasis supplied.)

Petani used her position to lie about Plaintiff who had done nothing other than take the COVID leave she needed. Petani's accusation was just the tip of the iceburg. Petani then used her position to manipulate Plaintiff's schedule, told Plaintiff to call in sick when she was already MDP, repeatedly accused Plaintiff of not returning back to work paperwork knowing it had been submitted, pulling Plaintiff's Pass Travel without purpose, lying to Jacobs and Prickett that Petani had instructed Plaintiff not to fly and that she flew anyway, starting an investigation of Plaintiff without cause. Admittedly, in the absence of the discriminatory motive these actions may be protected personnel management decisions. Here they were not because they were motivated by malice and ill will. (See additional briefing in Opposition to Petani MSJ)

### 2. Petani's Harassment resulted in the Termination of Plaintiff's 28-year old Employment.

The standard is severe *or* pervasive, not both. *Harvill v. Westward Communications, L.L.C.* (5th Cir. 2005) 433 Fed.3rd 428, 435; *Reeves v. C.H. Robinson Worldwide, Inc.* (11th Cir. 2010) 594 Fed.3rd 798, 811-812. Some cases permit Plaintiffs to support a hostile work environment claim by combining evidence of several different types of harassment. Although neither type alone is sufficiently severe or pervasive, the aggregate evidence of harassment based on protected classifications may be used to show the pervasiveness of harassment in the workplace. *Hafford v. Seidner* (6th Cri. 1999) 183 Fed.3rd 506, 515; *Hicks v. Gates Rubber Co.* (10th Cir. 1987) 833 Fed.2nd 1406, 1416.

Where the severe or pervasive abuse is questionable, "it is more appropriate to leave the assessment to the fact-finder than, for the court to decide the case on summary judgment." *Davis v. Team Elec. Co.* (9th Cir. 2008) 520 Fed.3rd 1080, 1096. One of the factors to be considered is whether the conduct unreasonably interferes with an employee's work performance. *Harris v. Forkleft Systems, Inc.,* (1993) 510 US 17, 23. Also, where a single offensive act by a co-employee does not establish a hostile work environment, the result may be different where the act is committed by a supervisor. *Dee v. Vintage Petroleum, Inc.* (2003) 106 Cal.App.4th 30, 35.

United asserts that Petani's conduct was trivial, isolated and sporadic. Whether conduct is severe or pervasive, where plaintiff's supervisors made at least a dozen racist comments to plaintiff over 14-month period, is a jury question. *Hernandez v. Valley View Hosp. Ass'n* (10th Cir. 2012) 684 F3d 950, 958 (Title VII). Here the comments / conduct occurred over the course of a month and a half (11/9/2020-12/21/2020). In comparison to *Hernandez* which involved, on average, one incident of harassment a month, there are triable issues of material fact as to whether Petani's repeated acts to get Plaintiff fired over the course of two months were harassing.

### 3. The Only Nexus between Petani's Harassment and Plaintiff is the fact that Plaintiff needed Extended COVID Leave due her Age and Disability.

Petani and Plaintiff's relationship started when Plaintiff told Petani that she had a disability that was keeping her from returning to work until 12/1/2020. Petani's response was to accuse Plaintiff of claiming false sick leave. Everything that happened after that was related to the fact that Plaintiff needed extended leave – the mess with the scheduling of flights (which would not have occurred if Petani had managed Plaintiff's leave as it was her obligation to do or hadn't told Plaintiff to call in sick knowing Plaintiff had already been identified MDP). United produced no evidence either on this motion or in the litigation as to when or how Plaintiff's Pass Travel information was pulled but by reasonable inference it had to be Petani. There was no reason to manufactured a problem other than Plaintiff's request for extended leave. In short, the only connection between Plaintiff and Petani is Plaintiff's sick leave, investigation and termination for reasons created by Petani.

### F.   Plaintiff's Failure to Engage in the Interactive Process and Failure to Accommodate Claims are Supported by Factual Allegations

Employers who are aware of an employee's disability have an affirmative duty to make reasonable accommodations for the disability. See, e.g., Gov't Code, § 12940, subd. (m)(1). This duty arises even if the employee has not requested an accommodation. (Cal. Code Regs., tit. 2, §11068(a); *see also Prilliman v. United Air Lines, Inc.* (1997) 53 Cal. App. 4th 935, 949-950. If a supervisor has acquired knowledge about an employee's disability, a conclusive presumption arises that the supervisor has reported that information. *California FEH v. Gemini Aluminum* (2004) 122 Cal. App 4th 1004, 1015; *Scotch v. Art Institute* (2009) 173 Cal.App.4th 986, 1018–1019. "[E]mployers must reasonably accommodate individuals falling within any of FEHA's statutorily defined 'disabilities,' *including those 'regarded as' disabled,* and must

engage in an informal, interactive process to determine any effective accommodations." *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54.

Defendant also had a duty to engage in the interactive process, another protected activity for which Untied is prohibited from retaliating. Cal. Code Regs., tit. 2, § 11069, subd. (a); Gov't Code, § 12940, subd. (n). Medical leaves are reasonable accommodations. Chin*, Practice Guide,* §9:2266 [possible accommodations include providing leave for **recovery**]

Here, Defendant knew that Plaintiff had contracted COVID-19 and that she continued to have lingering symptoms of brain fog because Plaintiff reported same and Plaintiff's physician sent notes confirming and Prickett acknowledged it at the 2nd investigatory meeting. United initially accommodated Plaintiff's request for leave but then restricted the accommodation, limiting Plaintiff's ability to travel during leave even though travel was not prohibited during leave – not even with use of the Pass Travel. United imposed the travel restriction as retaliation for taking extended COVID leave to address the post-viral symptoms. There was no interactive process to determine whether the travel was effectively related to Plaintiff's recovery from her disability. But even if it was not (it was) United fabricated a "no travel policy" to terminate Plaintiff because of her leave. United thus failed to engage in an interactive process or to provide the necessary reasonable accommodation.

### G.     Plaintiff's Action is based on FEHA Violations, not on breach of the JCBA and is not Preempted.

United's oft-repeated argument in employment actions based on state law violations is that they are preempted because the rules of employment are set forth in a collective bargaining agreement, here the JCBA. United is wrong. Plaintiff's claim in this action allege that United violated the FEHA by terminating Plaintiff for contracting COVID, failing to recover quickly, suffering from Covid brain fog, being at risk for repeated infection and the need for further time off. The violation would have been the same whether Plaintiff was an at will, contract, union or non-union employee. Plaintiff's claims herein are on all fours with those made in *Alaska Airlines v. Schurke* (9th Cir. 2018) 898 F.3d 904, 920-921 wherein the Court unambiguously held that rights based on state law are not preempted *even when the CBA must be referenced to define the terms and conditions of the employment.*

The Ninth Circuit has made clear that a two-step test applies for determining RLA preemption. "First, we determine whether the claim is 'grounded in' a CBA by asking whether the claim 'seeks purely to vindicate a right or duty created by the CBA itself.' … Second, if a

claim is not preempted under the first step, we ask whether adjudicating the state-law claim requires 'interpretation of a CBA, such that resolving the entire claim in court threatens the proper role of grievance and arbitration.' Interpretation in this context "means something more than 'consider,' 'refer to,' or 'apply.'" State-law claims are preempted under this second step only 'to the extent there is an active dispute over the meaning of contract terms.'" *Ward v. United Airlines, Inc.,* 986 F.3d 1234, 1244 (9th Cir. 2021).

Clearly, Plaintiffs' claims all survive the two steps of the RLA preemption test. See *id.* (indicating that first step of analysis is survived where plaintiffs "seek to vindicate a right created by California law, not one created by the CBAs themselves"). Also see *Soldinger v. Nw. Airlines, Inc.,* (1996) 51 Cal. App. 4th 345, where the Court held that an airline employee's claims of religious discrimination by disparate treatment, retaliation, failure to accommodate her religious beliefs and intentional infliction of emotional distress were not preempted by the RLA. The *Soldinger* court, at 359-360, poignantly stated "[There is no] clear and manifest congressional purpose to create a regime that broadly pre-empts substantive protections extended by the States, independent of any negotiated labor agreement." (*Hawaiian Airlines, Inc. v. Norris, supra,* 512 U.S. at p. 254, 114 S.Ct. at p. 2245.) Every lawsuit which may relate in some way to a collective bargaining agreement is not necessarily preempted. (*Allis–Chalmers Corp.* v. *Lueck* (1985) 471 U.S. 202, 220, 105 S.Ct. 1904, 1915–1916, 85 L.Ed.2d 206.) The preemption determination is considered on a case-by-case basis. (*Ibid.*) "[S]ubstantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA." (*Hawaiian Airlines, Inc. v. Norris, supra,* 512 U.S. at p. 257, 114 S.Ct. at p. 2246.)"

United argues that determining whether the use of Pass Travel constituted just cause or whether there was an abuse of sick leave requires interpretation of the JCBA thereby requiring RLA preemption. The same arguments were rejected in *Schurke* and should likewise be rejected here. Plaintiff does not allege that United should be held liable for violating the sick leave provisions of the JCBA. Plaintiff does not even allege that United's liability rests on violation of the just cause provision. Plaintiff alleges violation of the FEHA, a state created (not JCBA created) right. Consistent with *Schurke* and *Soldinger* Plaintiff's claims are not preempted.

Here, there is no dispute that the JCBA framed Plaintiff's employment with United. However Plaintiff makes no claim for breach of the JCBA. Stated differently, Plaintiff makes no claim that she was wrongfully terminated in violation of the just cause provision of the CBA.

Plaintiff's claim is that she was terminated because she contracted COVID, required an extended leave to recover from COVID and was in the portion of the population most likely to contract COVID again thereby requiring additional leave which is why her termination was ordered "from the top" of United's corporate structure. Does the court need to refer to the JCBA to determine the terms of Plaintiff's employment: Yes. Does mere reference to the terms of the JCBA preempt an action based on state rights violations: No.

Here, Plaintiff's claims all survive the first step of the RLA preemption test in that they seek to vindicate rights created by California law.  Moreover, Defendant fails to identify any provision of the JCBA that requires interpretation to adjudicate Plaintiff's state rights claims. Plaintiff's claims, including but not limited to violation of the FEHA are claims that have specifically been held not preempted by the RLA. Wrongful discharge claims based on public policy violations are not preempted because such claims are derived from sources outside the JCBA. *Saridakis v. United Airlines* (9th Cir. 1999) 166 F3d 1272, 1278; *Fry v. Airline Pilots Ass'n. Intern., supra,* 88 F.3d 831 is also instructive. Claims for retaliatory discharge have been held not preempted because their resolution requires determination only of whether the employer acted with retaliatory intent, rather than an interpretation of the collective bargaining agreement. *Hawaiian Airlines, Inc. v. Norris* (1994) 512 US 246, 266.

Defendant cannot show that Plaintiff seeks to vindicate a right or duty created by the JCBA. The JCBA does not preempt discrimination, harassment and retaliation laws. Plaintiff does not premise her wrongful termination claim on any right created by the JCBA but on the public policies derived in part from the FEHA. Defendant's preemption argument is frivolous.

### H.    Punitive Damages

Discrimination and retaliation in violation of FEHA is despicable. *Cloud v. Casey* (1999) 76 Cal. App. 4th 895, [evidence of discrimination and pretext established malice or oppression, as basis for punitive damages.] If there are triable issues of material fact as to Plaintiff's FEHA claims, there is a basis for punitive damages. As previously set forth, Cavanagh, a senior manager at the top of United's corporate structure worked with Prickett to terminate Plaintiff. At a minimum., the court should question why such an important manager would bother not just monitoring but directing the termination of a FA. Whether punitive damages should be awarded is a question of fact for the jury.

Respectfully submitted,
LAW OFFICE OF SOHAILA SAGHEB

DATED: May 14, 2024

*/s/ Sohaila Sagheb*
SOHAILA SAGHEB
Attorney for Plaintiff Gladys C. Salas